(No. 84933.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. KEITH SHUM, Appellant.

*Opinion filed May 22, 2003.—Rehearing denied September 29, 2003.*

Marshall Hartman, Deputy Defender, Anna Ahronheim, Acting Deputy Defender, and John C. Greenlees, all of Chicago, and Sharon Hicks, of Urbana, all of the Office of the State Appellate Defender, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb, James E. Fitzgerald and William L. Tof-

fenetti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GARMAN delivered the opinion of the court:

After a jury trial, defendant, Keith Shum,[1] was convicted of murder, feticide, attempted murder, and two counts of rape. Defendant waived a jury for the sentencing phase of trial, and he was sentenced to death for murder and to concurrent sentences of 60 years for feticide, 60 years for attempted murder, and 30 years for each rape. His convictions and sentences were affirmed on direct appeal. *People v. Shum*, 117 Ill. 2d 317 (1987). Defendant filed a *pro se* postconviction petition in 1988; he filed an amended petition through counsel on September 24, 1997. After oral argument, the circuit court granted the State's motion to dismiss the postconviction petition. While that judgment was pending on appeal, we remanded the matter to the circuit court, while retaining jurisdiction, for a fitness hearing pursuant to *People v. Owens*, 139 Ill. 2d 351 (1990). The circuit court found defendant fit to participate in postconviction proceedings.

At the time defendant filed his appeal of the dismissal of his postconviction petition, his death sentence triggered our exclusive jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Supreme Court Rule 651(a) (134 Ill. 2d R. 651(a)). Subsequently, the Governor commuted his death sentence. Although the constitutional basis for our direct appeal is no longer present, we choose in our

---

[1]Defendant's name is Keith Shurn, but for several years this court and prison records have referred to him as Keith Shum. We will refer to him and his relatives as the Shums throughout the opinion for consistency and to avoid confusion with earlier documentation.

discretion to retain jurisdiction over this case. See *McGill v. Illinois Power Co.*, 18 Ill. 2d 242, 244 (1959); *People ex rel. Farwell v. Kelly*, 367 Ill. 616, 618 (1937).

An appellate issue is moot when it is abstract or presents no controversy. *People v. Blaylock*, 202 Ill. 2d 319, 325 (2002). An issue can become moot if circumstances change during the pendency of an appeal that prevent the reviewing court from being able to render effectual relief. *People v. Jackson*, 199 Ill. 2d 286, 294 (2002). In this appeal, defendant raises two issues challenging his sentence, including ineffective assistance of counsel at sentencing and improper denial of request to depose trial counsel about the sentencing hearing. Subsequent to the filing of his appeal, the Governor commuted his death sentence to natural life imprisonment without the possibility of parole or mandatory supervised release. Commutation removes the judicially imposed sentence and replaces it with a lesser, executively imposed sentence. *People ex rel. Johnson v. Murphy*, 257 Ill. 564, 566 (1913); Black's Law Dictionary 274 (7th ed. 1999). Thus, the commutation rendered these sentencing issues moot. See, *e.g.*, *Lewis v. Commonwealth*, 218 Va. 31, 38, 235 S.E.2d 320, 325 (1977); *State v. Mitchell*, 239 Or. 87, 88, 396 P.2d 572, 573 (1964). We, therefore, address only the viable, nonsentencing issues.

Defendant now appeals the denial of postconviction relief, raising three viable issues: (1) whether the circuit court erred in finding defendant fit for trial; (2) whether the circuit court erred in finding defendant fit for postconviction proceedings; and (3) whether the circuit court improperly refused to order DNA testing, where such testing was not available at the time of trial and may provide new evidence of defendant's innocence. In the wake of the governor's commutation of his sentence, defendant filed a motion for DNA testing before this court. We ordered that this motion be taken with the case.

## BACKGROUND

Gwendolyn Whipple was living with Theresa Conway and Conway's three children in an apartment in Chicago. Conway and Whipple previously had met defendant through Conway's boyfriend, Mark Aytchan; Conway knew defendant only as "Keith." Whipple was nine months pregnant at the time of the crimes. Between 11:15 and 11:30 p.m. on July 6, 1982, the two women heard a knock at their door. The visitor told them it was "Keith." Conway later identified defendant as the person they let into the apartment.

Defendant offered the women some marijuana, and the three of them shared a marijuana cigarette. He told them that Aytchan had asked him to watch over them while Aytchan was in Cook County jail awaiting trial for burglary. Conway accused defendant of lying because she had recently talked to Aytchan, and he did not mention telling this to defendant. Defendant became angry and pushed the sharp tip of his umbrella at Conway's left jaw. Conway pushed the umbrella away and ran across the room to grab a knife. Defendant pulled out a gun. Conway said she thought the gun was only a toy. Defendant showed them the bullets in the gun, so she dropped the knife.

Defendant demanded that the two women lie side by side, facedown on a bed. One of Conway's children came to check out the source of the noise that had awakened him. Defendant pointed the gun at the boy's forehead. Conway approached defendant and urged him to shoot her instead of her son. Defendant ordered Conway to tell her son to go back to bed and told her to lie down next to Whipple.

Defendant walked behind Conway and undressed her from the waist down. He had sexual intercourse with her while he pointed the gun at Whipple's head. Defendant undressed Whipple from the waist down and had sexual intercourse with her. Next, defendant threatened to kill

them if they both did not perform oral sex on him, so first Conway and then Whipple complied. Afterward, defendant sat on the window ledge next to the bed. He pointed the gun at each of them while saying, "I'm going to kill you." He fired several shots.

Conway received gunshot injuries to her right mandible, the right side of her neck, and her right arm. Whipple received five gunshot wounds, including two to her left shoulder, two to the left side of her forehead, and one to her head. When Conway looked up, defendant had fled. She noticed Whipple's injuries, so she ran to get help. She went to the nearby apartment of Gus and Marquita Wilson. Gus Wilson testified that there was an urgent knock at the door around 1 a.m. Wilson opened the door, and a bloody Conway told him that she and Whipple had been shot. Wilson asked who had shot them, and she answered, "Keith."

Wilson went to Conway's apartment. He discovered that Conway's three children were uninjured. He then checked Whipple, but he was unable to find a pulse. He called for help. The paramedic who arrived at the scene also was unable to find any vital signs for Whipple or for her unborn baby. He testified that in his opinion both Whipple and her fetus were dead when he arrived. Conway was taken to St. Bernard's Hospital.

About an hour later, two detectives from the Chicago police department interviewed Conway. Conway described the perpetrator and told them his name was Keith. She said that her boyfriend, Mark Aytchan, knew more about Keith, and Aytchan was currently in Cook County jail. An hour later, the police questioned Aytchan, and he told them that Conway must be referring to Keith Shum, the defendant. He gave them Shum's address.

The police went to this address, and defendant's aunt, Bernice Shum, answered the door. The detectives found defendant undressed and asleep on a couch. After he was

awakened, they identified themselves as policemen, told him why they were there, and gave him *Miranda* warnings. Defendant denied involvement in the incident. The detectives took defendant to Conway's hospital room, and she immediately identified him as the person who had raped and shot her and Gwendolyn Whipple. Police reports disclosed that a "rape kit" or "Vitullo kit" was obtained from Conway. Throughout questioning by police officers and an assistant State's Attorney, defendant denied his involvement in the crimes.

Defendant was charged by indictment on July 7, 1982, with murder, attempted murder, two counts of rape, two counts of deviate sexual assault, two counts of unlawful restraint, aggravated battery, armed violence, and feticide. The charges of deviate sexual assault, unlawful restraint, aggravated battery, and armed violence were dismissed just before the trial. On July 29, 1982, the public defender requested a fitness and sanity evaluation. On August 17, 1982, psychiatrist Dr. Albert Stipes sent a report to the court stating his opinion that defendant was fit to stand trial and was legally sane. Again upon request of defense counsel, defendant was examined on September 14, 1984, by psychiatrist Dr. Gilbert Bogen, who also concluded he was fit to stand trial. Following a jury trial on September 12 through 18, 1984, the jury, after 20 minutes of deliberation, found defendant guilty of two counts of rape, feticide, attempted murder, and murder.

Defendant waived a jury for the sentencing phase. Defense counsel requested that defendant's fitness for sentencing be evaluated. The judge ordered a psychiatric examination. On October 9, 1984, Dr. R.A. Reifman concluded that defendant was fit for sentencing. The trial court found defendant eligible for the death penalty. The court found insufficient mitigating evidence to allow him to sentence defendant to life in prison rather than death.

On direct appeal, this court addressed 21 arguments raised by defendant challenging his convictions. We affirmed his convictions and sentences on April 2, 1987. *People v. Shum*, 117 Ill. 2d 317, 375 (1987).

Defendant filed a postconviction petition on August 16, 1988. In a *pro se* motion for appointment of counsel, defendant alleged that during the pendency of his postconviction proceedings, he had disagreements over discovery issues with the several different attorneys from the Illinois Capital Litigation Division of the State Appellate Defender. Defendant said he would rather proceed *pro se* than have an attorney from that division represent him. These disagreements delayed the filing of an amended postconviction petition until September 24, 1997. On October 23, 1997, appointed counsel filed a motion to determine fitness to proceed in postconviction proceedings because defendant resisted assisting his attorneys in defending him.

The State filed a motion to dismiss defendant's postconviction petition. On December 24, 1997, the trial court granted the State's motion. Regarding the DNA testing requested in the amended petition, the court declined to order the testing under section 116—3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116—3 (West 1998)) because the Post-Conviction Hearing Act is not a vehicle for enforcing criminal procedural rules but instead is a means to evaluate whether constitutional deprivations occurred during the proceeding leading to defendant's conviction. In addition, the court found the defendant's claim that DNA testing would exonerate him was speculative. According to the court, identity was not an issue in the case because the victim who positively identified defendant had met him on prior occasions. Defendant appealed the trial court's dismissal of his amended postconviction petition to this court.

On July 1, 1998, while retaining jurisdiction, we

remanded the matter to the trial court for an evaluation of whether defendant was fit for postconviction proceedings under *People v. Owens*, 139 Ill. 2d 351 (1990). The fitness hearing began on July 17, 2000. The State's first witness was Dr. Matthew Markos, director of Forensic Clinical Services of the Circuit Court of Cook County. Markos testified that he found no evidence of schizophrenia, psychosis, or organic mental disorder. Markos concluded that defendant's uncooperative actions towards his attorneys were a product of volitional choice rather than actions compelled by mental illness, so defendant was fit for postconviction proceedings.

On August 28, 2000, the hearing continued with psychiatrist Dr. Carl Wahlstrom's testimony for the State. Wahlstrom testified that he found no signs of schizophrenia, psychosis, or organic brain injury. While defendant was somewhat stubborn and adamant about his desire to obtain discovery materials, he concluded that defendant met the standard of fitness for postconviction proceedings.

The defense called psychiatrist Dr. Henry Conroe as its sole witness at the hearing. Conroe testified that defendant's adamant belief that discovery materials would exonerate him was delusional, and his fixation on this issue prevented him from helping his attorneys with any other issue. Conroe concluded that defendant was unfit for postconviction proceedings.

Closing arguments in the fitness hearing were conducted on August 29; the trial court found defendant fit for postconviction proceedings on August 30, 2000.

## ANALYSIS

This case comes to this court for review of the circuit court's dismissal of defendant's postconviction petition. Proceedings under the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 2000)) are a collateral attack on the judgment rather than a direct appeal. *People v.*

*Whitehead*, 169 Ill. 2d 355, 370 (1996). During postconviction proceedings, the burden is on defendant to make a substantial showing of a deprivation of a constitutional right. *Whitehead*, 169 Ill. 2d at 370. Defendant is entitled to an evidentiary hearing only if the defendant meets this burden; the circuit court accepts as true all well-pleaded facts in the petition and supporting affidavits. *People v. Coleman*, 183 Ill. 2d 366, 378, 380-81 (1998). We review *de novo* the circuit court's dismissal of a postconviction petition without an evidentiary hearing. *Coleman*, 183 Ill. 2d at 389.

Defendant raises three viable claims in this court: (1) unfitness to stand trial; (2) unfitness for postconviction proceedings; and (3) actual innocence, requesting DNA testing of the Vitullo rape kit under section 116—3 of the Code (725 ILCS 5/116—3 (West 1998)).

## I. Defendant's Fitness to Stand Trial

The due process clause of the fourteenth amendment bars prosecuting a defendant who is not fit to stand trial. *People v. Haynes*, 174 Ill. 2d 204, 226 (1996). A defendant is presumed to be fit to stand trial. Ill. Rev. Stat. 1983, ch. 38, par. 104—10, now codified at 725 ILCS 5/104—10 (West 2000); *People v. Johnson*, 191 Ill. 2d 257, 269 (2000). A defendant is unfit to stand trial if his mental or physical condition prevents him from understanding the nature and purpose of the proceedings against him or to assist in his defense. 725 ILCS 5/104—10 (West 2000); *People v. Jamison*, 197 Ill. 2d 135, 152 (2001). If there is a *bona fide* doubt that the defendant is fit to stand trial, the court shall order a fitness hearing. 725 ILCS 5/104—11(a) (West 2000); *People v. Eddmonds*, 143 Ill. 2d 501, 512 (1991). During postconviction proceedings challenging a finding of fitness, defendant must show in his petition sufficient facts to raise a *bona fide* doubt of his fitness to stand trial. *People v. Easley*, 192 Ill. 2d 307, 319 (2000). We review *de novo* the trial court's dismissal of

this postconviction claim without an evidentiary hearing. *Coleman*, 183 Ill. 2d at 389.

During postconviction review, the circuit court rejected the claim of unfitness to stand trial as waived because it had not been raised on direct appeal. Issues that could have been presented on direct appeal are waived. *Whitehead*, 169 Ill. 2d at 371. The doctrine of waiver can be relaxed when fundamental fairness requires or when the facts supporting the claim are not in the original appellate record. *Whitehead*, 169 Ill. 2d at 371-72.

In *People v. Harris*, 206 Ill. 2d 293 (2002), the postconviction attorney gathered evidence that defendant showed signs of depression, a personality disorder, and organic brain damage. Defendant raised the postconviction claim that trial counsel was ineffective for failing to seek a fitness hearing, but this claim had not been raised on direct appeal. We considered the claim on the merits under the exception to waiver that information was outside the appellate record because of this psychiatric information gathered during postconviction. *Harris*, 206 Ill. 2d at 302-03. Similarly, we considered a postconviction claim not raised on direct appeal because of information from psychiatric examinations conducted six years after defendant's conviction in *Easley*, 192 Ill. 2d at 322. Therefore, we will consider defendant's claim that he was unfit to stand trial rather than apply the doctrine of waiver. In order to succeed, defendant must show in his petition sufficient facts to raise a *bona fide* doubt of his fitness to stand trial. *Easley*, 192 Ill. 2d at 318-19.

Attached to defendant's amended petition was the report of neuropsychologist Dr. Jonathan Hess, who found evidence that defendant experienced auditory verbal memory retrieval problems. Hess concluded that these problems were caused by brain injury, specifically frontal lobe impairment, in his report of November 29,

1997. The petition also included the report of forensic social worker Alice Washington, who outlined the generations of schizophrenia and other mental illness in the Shum family, including the illnesses of his mother and brother. Defendant filed the report of psychiatrist Dr. Bernard Block as an exhibit to defendant's motion to reconsider the court's dismissal of the amended postconviction petition. Block interviewed defendant on November 20, 1997, and December 7, 1997. Block concluded that defendant understood the issues involved during the trial, but his insistence that he control his own case and his refusal to cooperate with his attorneys rendered him unfit to stand trial. The information from the reports of Hess, Washington, and Block were not in the record on appeal.

Evidence that a defendant is mentally unsound does not necessarily establish that he or she is unfit to stand trial because the fitness standard only concerns defendant's ability to understand the proceedings and assist counsel, not mental fitness in other areas of life. *Easley*, 192 Ill. 2d at 322; *Eddmonds*, 143 Ill. 2d at 519. Defendant showed the required ability in several ways. Defendant participated in his own defense by filing several motions *pro se*. The trial court and counsel explained to defendant his right to testify and his ability to waive his right to a jury at sentencing. Defendant demonstrated that he understood these rights in his deliberate decisions to testify and to waive the jury. Defendant spoke clearly in allocution during the mitigation phase of sentencing. Although defendant sometimes disagreed with his attorneys, it was because of differences of opinion about legal strategy rather than a lack of understanding of the proceedings.

Even taking as true the information from the reports of Hess, Washington, and Block (see *Coleman*, 183 Ill. 2d at 378), we find that defendant failed to raise a *bona fide*

doubt of defendant's fitness to stand trial. While these reports provide some evidence of mental illness, they are insufficient to counter these several indications that defendant understood and participated in the proceedings at trial. We also note that there is psychiatric evidence in the record to support the finding of fitness to stand trial. Upon the request of defense counsel, defendant was evaluated by Dr. Stipes, who concluded defendant was fit to stand trial and legally sane on August 17, 1982. Again upon the request of defense counsel, defendant was declared fit to stand trial by Dr. Bogen on September 14, 1984, contemporaneously with his trial. Therefore, defendant's claim that he was unfit to stand trial fails on the merits.

II. Defendant's Fitness in Postconviction Proceedings

On July 1, 1998, this court ordered the trial court to conduct a fitness hearing while defendant's postconviction petition was pending. The circuit court heard three witnesses at the hearing to determine fitness for postconviction proceedings. Dr. Matthew Markos, director of Forensic Clinical Services of the Circuit Court of Cook County, testified for the State. Dr. Markos reviewed: police reports; trial transcripts; *pro se* motions and motions filed by attorneys for both parties; information from the Illinois Department of Corrections master file; and reports of prior evaluations by Dr. Stipes (fit for trial and legally sane, August 1982), Dr. Bogen (fit for trial, September 1984), Dr. Reifman (fit for sentencing, October 1984), Dr. Hess (signs of frontal lobe impairment, November 1997), Dr. Block (unfit for trial and postconviction proceedings, December 1997), and Dr. Conroe (unfit for postconviction proceedings, January 2000). Markos acknowledged that he used the *Owens* standard to evaluate defendant. After defendant refused to participate upon Markos's first visit, he was able to conduct an interview with defendant on October 27,

1999. He testified that he found no evidence of organic brain damage or mental disorder. He stated that defendant is capable of cooperating with his attorneys and explaining his constitutional complaints. Any decision by defendant not to cooperate with his attorneys has been volitional rather than compelled by mental illness. Therefore, Markos concluded that defendant was fit for postconviction proceedings, as he described in his opinion letter dated November 22, 1999.

The State's second witness, psychiatrist Dr. Carl Wahlstrom, also inspected: police reports; motions; reports from the Illinois Department of Corrections; and reports by Hess, Block, Conroe, Stipes, Bogen, and Reifman under the *Owens* standard. Wahlstrom similarly found no evidence of organic brain injury, schizophrenia, or other mental illness. While defendant is stubborn and insistent about obtaining certain discovery materials, this does not amount to delusional paranoia. Wahlstrom concluded that defendant met the standard of fitness to participate in postconviction proceedings, which he confirmed in his opinion letter dated July 28, 2000.

Finally, psychiatrist Dr. Henry Conroe testified for the defense. Conroe examined: motions; police reports; the presentence investigation report; reports by Hess, Block and Markos; and the report of forensic social worker Alice Washington. Cross-examination revealed that Conroe did not review the trial transcripts or the reports of Stipes, Bogen, and Reifman, who all found defendant fit for trial or sentencing. He was notified of the *Owens* standard for fitness for postconviction proceedings only after his interview with defendant. Conroe characterized as delusional defendant's belief that he would be exonerated upon receipt of missing discovery materials. Defendant's fixation on discovery prevents him from assisting his attorneys with any other claim, and his failure to cooperate with his attorneys is not

volitional. He had the opportunity to observe defendant's interaction with one of his attorneys, John Greenlees, who was present during the interview. Conroe determined that defendant was unfit for postconviction proceedings, and he detailed his findings in an opinion letter dated January 8, 2000.

Defendant also has a history of refusing to cooperate with his attorneys. Defendant's disagreements with appointed counsel led to the participation of several different appointed defense attorneys and contributed to the delay of almost 10 years between the filing of the original *pro se* postconviction petition in August 1988 and the filing of the amended petition through counsel in September 1997.

In *Owens*, we explained that "a petitioner who is competent to communicate his allegations of constitutional deprivations to counsel is competent to participate in post-conviction proceedings." *Owens*, 139 Ill. 2d at 365. This fitness standard in postconviction proceedings is less demanding than the standard for fitness to stand trial. *People v. Johnson*, 191 Ill. 2d 257, 269 (2000). These standards vary because of the disparate nature of the proceedings. *Owens*, 139 Ill. 2d at 363-64. In addition, a defendant is presumed to be fit for postconviction proceedings. *Owens*, 139 Ill. 2d at 362. We will reverse the trial court's finding that defendant was fit for postconviction proceedings only if the trial court abused its discretion. *People v. Simpson*, 204 Ill. 2d 536, 548 (2001). We will find an abuse of discretion where the trial court's decision is " 'arbitrary, fanciful or unreasonable' " or " 'where no reasonable man would take the view adopted by the court.' " *People v. M.D.*, 101 Ill. 2d 73, 90 (1984), quoting *Peek v. United States*, 321 F.2d 934, 942 (9th Cir. 1963).

There is ample evidence supporting the circuit court's conclusion that defendant satisfied the low standard of

fitness required for postconviction proceedings. Two expert witnesses explained their opinions that defendant met the *Owens* standard. Defendant has participated in his case through *pro se* filings during postconviction review. We are unwilling to conclude that a defendant's lack of cooperation with his or her attorneys, if volitional, supports a finding of unfitness for postconviction proceedings. Markos and Wahlstrom both concluded that defendant made a volitional choice to fight his attorneys. True, Conroe opined that defendant's resistance was delusional rather than volitional. However, the circuit court considered the testimony of all three expert witnesses and found defendant fit under the *Owens* standard. We cannot say that this finding of fitness was " 'arbitrary, fanciful or unreasonable' " (see *M.D.*, 101 Ill. 2d at 90, quoting *Peek*, 321 F.2d at 942) warranting reversal under the abuse of discretion standard. We affirm the circuit court's determination that defendant was fit for postconviction proceedings.

### III. Actual Innocence: DNA Testing Under Section 116—3

Forensic DNA testing was not available at the time of defendant's trial in September 1984. Section 116—3 was not in force when defendant filed his amended postconviction petition in September 1997. Effective January 1, 1998, the General Assembly enacted section 116—3, which explains the process defendants must follow to obtain fingerprint or forensic testing not available at trial regarding actual innocence. 725 ILCS 5/116—3 (West 2000). Section 116—3 provides:

> "(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint or forensic DNA testing on evidence that was secured in relation to the trial which resulted in his or her conviction, but which was not subject to the testing which is now requested because the

technology for the testing was not available at the time of trial. Reasonable notice of the motion shall be served upon the State.

    (b) The defendant must present a prima facie case that:

        (1) identity was the issue in the trial which resulted in his or her conviction; and

        (2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

    (c) The trial court shall allow the testing under reasonable conditions designed to protect the State's interests in the integrity of the evidence and the testing process upon a determination that:

        (1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence;

        (2) the testing requested employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116—3 (West 2000).

On December 24, 1997, the judge granted the State's motion to dismiss defendant's amended postconviction petition. This included a dismissal of defendant's claim of actual innocence and a specific denial of defendant's request for DNA testing of the Vitullo rape kit that cited section 116—3 (725 ILCS 5/116—3 (West 1998)). The trial court found that the Post-Conviction Hearing Act was an improper means to pursue enforcement of this criminal procedure provision because the Act addresses allegations of constitutional violations during the original trial. See *Coleman*, 183 Ill. 2d at 380. A claim of actual innocence supported by newly discovered evidence is properly raised in postconviction proceedings. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). However, the circuit court noted that defendant's argument that DNA testing of the Vitullo rape kit could provide evidence of actual innocence was only speculative because identity was not an issue in the case. The court stated that

identity was not disputed because of the positive identification by the victim, who had been acquainted with defendant prior to the crime. We review *de novo* the dismissal of a postconviction claim without an evidentiary hearing. *Coleman*, 183 Ill. 2d at 389. We also review *de novo* the ruling denying a section 116—3 motion. *People v. Franks*, 323 Ill. App. 3d 660, 662 (2001).

In *People v. Johnson*, 205 Ill. 2d 381 (2002), defendant argued in his postconviction petition, citing section 116—3, that testing the Vitullo rape kit would cast doubt on his convictions for rape and murder because the surviving victim, Patricia Payne, told police that the crimes had been committed by a single assailant. Defendant noted that the only direct evidence of his guilt was Payne's identification testimony, and defendant never admitted to being at the crime scene. As a result, identity was a central issue to the case. Defendant also alleged in his petition that the hospital had taken a Vitullo rape kit that had been delivered to the State Police Crime Lab, which would store and preserve the sample in an uncontaminated manner. Defendant also attached to the petition documents about the gathering and transport of the Vitullo rape kit. The record was unclear about the current condition of the Vitullo kit or whether there was a testable sample, but defendant would not have access to this information. *Johnson*, 205 Ill. 2d at 391-92.

We concluded that defendant made a *prima facie* case for DNA testing under section 116—3 because he established that identity was a central issue at trial and that there had been a secure chain of custody for the Vitullo rape kit. Because the Vitullo kit was entered into evidence, it would remain in the possession of the circuit court clerk after defendant's conviction. Under section 116—3, the trial court evaluates whether DNA testing has the potential to produce new evidence "materially relevant" to defendant's actual-innocence claim. This

phrase has been interpreted to include evidence that will "significantly advance" defendant's claim; the evidence need not exonerate defendant by itself. Under the facts of this case, we held that the trial court erred in denying DNA testing pursuant to section 116—3. *Johnson*, 205 Ill. 2d at 396.

The circumstances of the present case are nearly identical to those of *Johnson*. The only direct evidence in this case is the identification of defendant by Theresa Conway for murder and rape in which there was a single assailant, and defendant has consistently denied involvement in the crimes. Defendant alleges in his petition that the hospital took a Vitullo rape kit sample from Conway. The parties stipulated at trial that this sample was delivered to and retained by the State Police Crime Lab in a sealed container. The parties also stipulated that the sample tested positive for the presence of seminal material. The Vitullo kit was entered into evidence, so it would have remained in the possession of the circuit court clerk after defendant's conviction. In sum, defendant has established a *prima facie* case for DNA testing under section 116—3 because he established that identity was a central issue and that the evidence was subject to a secure chain of custody. If the DNA testing produces results favorable to defendant, this evidence will significantly advance defendant's claim of actual innocence. Therefore, the trial court erred in denying DNA testing.

Generally, section 116—3 permits a defendant to seek DNA testing by filing a motion before the trial court that entered the judgment of conviction. 725 ILCS 5/116—3 (West 2000); see *People v. Dunn*, 306 Ill. App. 3d 75, 80 (1999). In this case, defendant filed his postconviction petition and the trial court dismissed it after section 116—3 had been enacted but before its effective date. Under the unique temporal circumstances of this case, defendant was able to refer to the language of section

116—3 when drafting his petition, but he was unable to invoke it in an independent motion because the provision was not yet effective. A postconviction petition was the only means available for his request for relief at that time. Given the unusual facts of this 20-year-old case, little would be served by requiring defendant to replead the contents of this portion of his postconviction petition in a section 116—3 motion before the trial court when the petition otherwise clearly meets the requirements of section 116—3. In addition, the State has indicated that it does not oppose allowing DNA testing in this case. As discussed above, we find on the merits that defendant has made a *prima facie* case for DNA testing under the now-effective section 116—3. We reverse the trial court's denial of defendant's request for DNA testing.

In addition to denying defendant's request for DNA testing, the trial court dismissed defendant's claim of actual innocence. In order to support a claim of actual innocence, the defendant must submit new, noncumulative evidence material to the claim that could not have been obtained through due diligence at the time of trial. *Harris*, 206 Ill. 2d at 301. This evidence of actual innocence has to be " ' "of such conclusive character" ' " as would " ' "probably change the result on retrial." ' " *Washington*, 171 Ill. 2d at 489, quoting *People v. Silagy*, 116 Ill. 2d 357, 368 (1987), quoting *People v. Molstad*, 101 Ill. 2d 128, 134 (1984). The only "evidence" defendant provides in support of his claim of actual innocence is speculation that the DNA tests could show he was not the single perpetrator who attacked Gwendolyn Whipple and Theresa Conway. Until the test results can be considered, it is premature for us to evaluate the actual-innocence claim. We remand the matter to the circuit court to consider the actual-innocence claim on the merits after the DNA test results are completed.

## CONCLUSION

The trial court properly dismissed defendant's claims

of unfitness to stand trial and unfitness for postconviction proceedings. We reverse the trial court's denial of defendant's request for DNA testing under section 116—3. As a result, we decline presently to consider the actual-innocence claim from defendant's petition. We remand the matter to the circuit court with instructions to order the Illinois State Police Crime Lab to conduct DNA testing and to evaluate the actual-innocence claim in light of the test results. In light of this conclusion, defendant's motion for DNA testing taken with this case is denied as moot. For these reasons, we affirm in part, reverse in part, and remand the cause to the circuit court.

*Affirmed in part and reversed in part;*
*remanded with directions.*