NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 170753-U

NO. 4-17-0753

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 2, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Brown County |
| MICHAEL E. CRENSHAW, | ) | No. 09CF5 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Diane M. Lagoski, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Presiding Justice Steigmann and Justice Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The dismissal of defendant's motion for forensic testing is proper, as the testing would not produce materially relevant evidence to support defendant's contention he is innocent.

¶ 2   In July 2017, defendant, Michael E. Crenshaw, petitioned for further deoxyribonucleic acid (DNA) testing on evidence collected for his 2009 trial. The trial court dismissed the petition, upon finding the petition untimely filed or improperly served. Defendant appeals, alleging the court's findings were improper and his motion satisfies the statutory requirements of section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2016)). The State concedes defendant's petition was timely filed and properly served, but argues we should affirm as the sought-after testing would not produce evidence materially relevant to defendant's contention of innocence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            In February 2009, defendant was charged with the criminal sexual assault (720

ILCS 5/12-13(a)(3) (West 2008)) of his 15-year-old daughter, H.H.

¶ 5            At a bench trial, the court heard testimony from a number of State witnesses,

including two police officers who interviewed defendant, H.H., H.H.'s stepmother Stephanie,

H.H.'s brother, and two of H.H.'s friends.

¶ 6            Jason Garthaus, a special agent with the Illinois State Police, testified he

investigated H.H.'s allegations against defendant. Beginning in January 2009, H.H. made two

reports of inappropriate conduct by defendant. On January 14, 2009, Agent Garthaus and Agent

Kevin Kaufmann interviewed defendant regarding H.H.'s allegation defendant told her they had

had sex and she had no memory of it. Ultimately, the Department of Children and Family

Services (DCFS) deemed the allegation unfounded. In February, Agent Garthaus was contacted

by Justin Oliver from the Brown County Sheriff's Department. H.H. reported defendant sexually

assaulted her and she had an audio recording of the assault.

¶ 7            After learning of H.H.'s report, Agent Garthaus and Agent Kaufmann went to

Brown County to interview defendant. Defendant reported being very tired, as he had taken four

sleeping pills when he usually took two. Defendant did not appear under the influence; he "just

seemed tired." Defendant appeared to understand the officers and did not need assistance

"getting the seat belted or anything."

¶ 8            According to Agent Garthaus, during the interview, defendant said he went to

H.H.'s room on the night in question to get a backrub and "things then transpired from there."

Defendant had discussed the allegations with Stephanie, his wife, before the interview.

Defendant said he did not take a condom with him to the room. When asked if the condom broke, defendant reported he looked at the condom in a lit area and knew it was not torn.

¶ 9    When the officers asked defendant to tell them what happened, defendant reported he went upstairs to speak to H.H. Defendant said he laid on the floor, and H.H. walked on his back. Then, defendant reported he got onto H.H.'s bed and she massaged his back, hips, and upper butt area. Initially, defendant said his pajama bottoms were on, saying H.H. reached up his pant legs to massage his hamstrings but then admitted he was not wearing pajama pants. When asked if H.H. touched his penis, he said, "yes, a couple times."

¶ 10    Agent Garthaus testified defendant's admission followed the officers' presenting a scenario to which defendant agreed:

> "Agent Kaufmann presented to him that, you know, he went up there for a backrub. As she was rubbing him, he became aroused; then he climbs on top of her, has intercourse with her; and as he's leaving the room, he gives her a kiss at some point in time, I believe on the forehead, and tells her she needs to start getting along with her mother, Stephanie. And prior to presenting that scenario, he was told that, at any point in time he could interject and make a correction or interject anything that needed to be brought out involved with the scenario. And he never did interject anything on the scenario that was presented to him. We just asked him if that's how it happened, and he said, I guess."

¶ 11    On cross-examination, Agent Garthaus agreed it would be important to get an

alleged victim to a hospital for a rape kit. However, it was roughly 22 hours after the alleged assault that Agent Garthaus learned the investigation was based on the new allegation of assault and not in relation to the January investigation. If Agent Garthaus had known H.H. had not showered and was still wearing the same clothing, he would have directed the Brown County deputy to take her to the hospital.

¶ 12        Agent Garthaus acknowledged a condom was not found. The scenarios presented by Agent Kaufmann occurred approximately 4.5 hours into the interview. Agent Garthaus further explained the admission regarding the absence of holes in the condom:

"A. *** [Defendant] kept his head down, occasionally shaking it from side to side, eventually saying no. That's after [defendant] was asked repeatedly if he saw any tears in the condom.

Q. And then?

A. Shaking his head side to side like this meaning no.

Q. Go on.

A. [Defendant] was repeatedly asked if he observed the condom in a lit room. [Defendant's] tone of voice appeared to become irritated. Then he stated his house was lit; meaning he would have observed it in a lit room because his house was lit.

Q. He didn't say that though, did he?

A. No, but that's how we perceived it."

¶ 13        Kevin Kaufmann, a special agent with the Illinois State Police, testified, in early

February 2009, when he called defendant to set up the interview with him and Agent Garthaus, defendant "made a comment about, something about being arrested, and made a comment also about, you know, going up to [H.H.'s] room for a massage." Defendant made a similar comment when he was picked up. He mentioned "being arrested" and asked "what he would be looking at."

¶ 14    Agent Kaufmann's testimony regarding the interview was substantially similar to Agent Garthaus's testimony. Agent Kaufmann testified, after defendant responded "I guess" to the scenario he presented where the massage advanced to sexual intercourse, defendant asked again "what he was looking at." Defendant also wanted them to know he did not go upstairs intending to have sex with H.H. He did not look at his daughter that way. Agent Kaufmann asked if this had occurred before. Defendant indicated it had.

¶ 15    Agent Kaufmann confirmed bedding, clothing, and hairs were collected from H.H.'s room. The items were tested for semen. No comparison samples were taken from defendant.

¶ 16    H.H. testified her father got custody of her when she was 5 years old. At that time, defendant was married to Stephanie. H.H. considered Stephanie as her mother. H.H. did not feel she and defendant had much of a relationship. Defendant had not been involved in her life. He became more involved after he learned H.H. had become sexually active. He began visiting her room late at night to talk about "grades and everything."

¶ 17    In November 2008, H.H. had a project for one of her classes. She asked defendant to assist her. They worked on the project until around 1 a.m. When they decided to call it a night, H.H. started to head upstairs. Defendant grabbed her arm and told her they had had sex. H.H.

said she did not believe him. Defendant repeated this story to H.H. on multiple occasions and, each time, he reported an increasing number of sexual encounters. One night, defendant woke H.H. and told her they had just had sex. H.H. rolled over and ignored him. This behavior continued until January 2009 when H.H. reported the incidents. She told her two best friends and the school counselor. The school reported the incidents to DCFS. The next day, H.H. talked to Agent Kaufmann and someone from child advocacy. After the interview, H.H. stayed with her grandmother. The plan was for H.H. to stay with her grandmother. However, H.H. returned home on January 13, 2009. When H.H. returned home, defendant was in the house. H.H. was told to put her stuff down, so defendant and Stephanie could go through it. Defendant hit H.H.'s head and pinned her against the wall. Stephanie yelled at him to stop. New rules were imposed on H.H., such as not wearing tight clothes. If the rules were not followed, H.H. was threatened with being sent to a different town to live with her biological mother and grandparents.

¶ 18       On another night, according to H.H., defendant told H.H. he lied to DCFS so he could get "us" back. On another night, defendant called to H.H. to talk with him and Stephanie. Defendant asked about the sexual incidents with the two boys, if she enjoyed the acts, and whether she performed oral sex. He also said if she needed to pleasure herself to tell Stephanie and she would purchase a vibrator. Stephanie tried to leave the room, but defendant would not let her leave. Stephanie told H.H. never to go to her for a vibrator because she would not get her one.

¶ 19       On January 18, 2009, H.H. went to her room. Defendant told her sex "was going to happen" or she would be sent away. H.H. refused. Defendant became angry. H.H. tried to escape defendant by going into the bathroom, but defendant followed her. Defendant kept telling

her "it was going to happen." Defendant struck H.H. with a flashlight. She began crying. Defendant told her to lie down. He removed her pants and got on top of H.H. No intercourse happened that night. Defendant got up and left.

¶ 20    Some time later, on a night the family went to Walmart, defendant went to her room and sexually assaulted H.H.

¶ 21    On January 31, 2008, defendant woke H.H. late at night or in the early morning. Defendant was pulling down H.H.'s pants. She pulled them back up. Defendant put his penis in H.H.'s vagina. H.H. cried and rolled over. Defendant put on his clothes, grabbed the flashlight and the towels he brought up, and left.

¶ 22    The third incident of sexual intercourse occurred early on February 9, 2009. Before the incident, H.H. had learned she could audio-record on her phone. A friend suggested H.H. record the next time it occurred. Defendant told H.H. earlier that day he was coming to her room that night. H.H. fell asleep. Defendant woke her. H.H. rolled over and saw that it was 12:30 a.m. Defendant was talking about something. Defendant put on a condom. He then put his penis into her vagina. H.H. recorded 20 seconds of the assault on her cell phone. Defendant left her room at 1:30 a.m. H.H. got up the next morning and went to school. She played the recording for her two best friends. They tried to convince her to report the incident to a counselor, but H.H. refused. She was afraid of defendant.

¶ 23    After school, H.H. told her brother. He went to get Stephanie. At her brother's urging, H.H. went to get her phone. H.H. told Stephanie what happened and played the recording. After Stephanie heard the recording, they loaded the van and Stephanie left with H.H.'s younger siblings. H.H.'s brother went to a friend's house. H.H. went to her friend's

boyfriend's house, where they called the police. By this time, it was late in the evening on February 9, 2009. A state police officer came to the house. The officer asked H.H. to play the recording. He then went outside to call Stephanie. H.H. went to stay with an aunt and uncle. On February 11, 2009, H.H. was asked to go to the hospital. She complied.

¶ 24       On cross-examination, H.H. testified she had not washed her bedsheets from February 9, 2009, or her underwear. Everyone was home and in bed when the incident occurred. The house had squeaky floors. Defendant was unhappy with H.H.'s poor grades and her sexual activity with boys. Defendant also confronted H.H. about the screen in her bedroom having been pried open, telling her either H.H. exited the window or someone else entered.

¶ 25       Stephanie Crenshaw, defendant's wife, testified they had been married 11 years but had been in a relationship for 15 years. Stephanie had known H.H., her stepdaughter, since she was 15 months old. Stephanie was very close to H.H. and L.H., H.H.'s brother and Stephanie's stepson. Defendant was "very hard" on the children. He did not attend sporting events. He was "very negative" and "very strict." Defendant did not spend time with H.H. However, after Stephanie and defendant learned H.H. had become sexually active, defendant began wanting to spend more alone time with her. He wanted to talk to her and take her on motorcycle rides. Defendant wanted H.H. to stay up late in the evening with him. Stephanie found this change in behavior odd.

¶ 26       As of late 2008, Stephanie noticed H.H.'s grades had begun slipping. In early 2009, Stephanie participated in the initial investigation involving H.H.'s allegations. Stephanie did not believe H.H. The situation made no sense to Stephanie and H.H. had no proof. Stephanie feared H.H.'s false accusations would ruin the family. Stephanie talked to defendant and they

decided to give Stephanie's mother guardianship over H.H. The plan, however, did not occur. Defendant learned H.H. had been sexually active again. Defendant told Stephanie H.H. was coming home. Stephanie protested, and was angry and sad. Stephanie believed defendant was making a terrible decision and told him so. The two ended up arguing. Defendant became angry, grabbed Stephanie by the throat, slammed her against the closet and spit on her.

¶ 27　　　　Stephanie testified she was very angry after the January accusations, so H.H.'s freedom was limited. She and defendant took away her phone and did not permit her to talk on the house phone. H.H. was not allowed to go out with friends. Defendant smacked H.H. in the face and screamed at her. On another occasion, defendant wanted to talk to H.H. in her room and asked Stephanie to accompany him. Defendant asked H.H. why she had sex with the boy and if she enjoyed it. He asked about oral sex. Stephanie, who found the discussion disgusting, tried to leave the room, but defendant told her to stay. Defendant told H.H. if she wanted a vibrator, Stephanie would buy her one.

¶ 28　　　　During this period of time, Stephanie was very distant from H.H. Stephanie was angry. Defendant was very involved with H.H., constantly going up to her room to talk to her.

¶ 29　　　　Stephanie testified about the events of February 9, 2009. Stephanie arrived home after work and the children were already home. Before arriving home, she learned L.H. had approximately 20 missing assignments, so Stephanie was very angry. As soon as she arrived home, she began yelling at L.H. L.H. began screaming and told H.H. to let Stephanie "listen to it." Again, he told H.H. to let Stephanie listen to her phone. H.H. was upset and crying. She did not want Stephanie to hear it. H.H. went to her room but returned crying and shaking. H.H. played the phone recording for Stephanie. Stephanie heard H.H. and defendant. When asked why

she believed it was defendant on the recording, she said she had been with defendant 15 years and knew the sound he makes when he was "being sexually gratified." Stephanie testified defendant said the same things to her. Stephanie immediately loaded the van and took her and defendant's two children. H.H. and L.H. went to friends' houses. After 11 p.m. that night, defendant contacted her.

¶ 30 Stephanie explained the sleeping arrangements in her house. Defendant did not sleep with her. He slept in their son's room. The 2 younger children slept with Stephanie. Stephanie's bedroom was in the far back part of the house. At night, both doors to the bedroom were closed.

¶ 31 On cross-examination, Stephanie testified she had commenced divorce proceedings. Custody of her and defendant's children was an issue in those proceedings. Stephanie was seeking custody.

¶ 32 H.H.'s brother and friends testified as well. L.H. testified he heard the recording on H.H.'s phone. L.H. stated he heard his father "whispering" in the recording. Two friends of H.H. testified H.H., on February 9, 2009, told them she had been sexually assaulted.

¶ 33 Defendant called multiple witnesses to testify on his behalf, including Aaron Small, a forensic scientist with the Illinois State Police. Small's primary duties in this role were to determine whether body fluids are present, collect stains, and preserve them for forensic DNA analysis. Taping for hairs, fibers and debris occurred on H.H.'s bra and underwear. The tapings were not analyzed. Small found no semen on the bedding, which included an orange fitted sheet, an orange top sheet, orange pillowcase, a white pillow, a multicolored quilt, and a pink comforter. "Apparent hairs, fibers and debris were collected on tapings" of the bedding. The

tapings were not tested. On cross-examination, Small opined a condom would reduce the likelihood semen would be found in a sexual assault kit.

¶ 34　　　　Defendant testified on his own behalf. He felt like H.H.'s sexual activity with boys was a way of reaching out for a male figure to be involved in her life. Defendant felt guilt about not being involved, so he became more involved. They talked more. He hugged her. Defendant denied having sexual relations with H.H.

¶ 35　　　　Defendant admitted the conversation to which Stephanie and H.H. testified but said it did not occur "quite the way that they made it out to be." Defendant admitted asking about oral sex to "show my wife her mentality of how she was." Defendant admitted hitting H.H. when she walked in the door after she returned home. He did so because "it almost destroyed our whole family."

¶ 36　　　　On cross-examination, defendant stated H.H. would rub his back slightly and walk on it. He did not consider that a massage. Defendant "always went up to her room." They talked at nighttime. Defendant's work schedule was 3 p.m. to 11 p.m. When asked if it was proper to go to his sleeping daughter's room at midnight to get a massage or have her walk on his back on a school night, defendant responded if they had to discuss something about problems or if his back was bothering him, he would.

¶ 37　　　　At the close of the evidence, the trial court found the State met its burden of proving defendant guilty beyond a reasonable doubt. The court provided a lengthy description of its findings. First, the court noted its irritation at the absence of physical evidence, stating the officer should have escorted H.H. to the hospital for a sexual-assault kit as soon as she reported the offense. The court observed there was no analysis of hairs and fibers. The court also wished

there was some sort of voice analysis. The court noted the matter turned on credibility. The court gave a lengthy description of its analysis of the testimony at trial and concluded defendant was guilty beyond a reasonable doubt.

¶ 38 Defendant was sentenced to eight years' imprisonment. Defendant pursued a direct appeal of his conviction and sentence. On appeal, defendant argued his confession was involuntary due to his ingestion of multiple drugs, the recording of the alleged assault was substantially inaudible and should not have been admitted, and his sentence was excessive. *People v. Crenshaw*, 2011 IL App (4th) 090908, ¶¶ 17, 20, 23, 959 N.E.2d 703. We affirmed. *Id.* ¶ 27.

¶ 39 While his direct appeal was pending, defendant filed his first *pro se* postconviction petition. It was denied, and we affirmed the denial on appeal. *People v. Crenshaw*, 2012 IL App (4th) 110202, ¶¶ 8, 18, 974 N.E.2d 1002. Since that time, defendant has filed multiple successive postconviction petitions, with no success. See generally *People v. Crenshaw*, 2018 IL App (4th) 160376-U, ¶¶ 16-28, 50. He has also filed a petition for relief from judgment under section 2-1401 of the Code of Civil Procedure, which was denied and the denial affirmed. *People v. Crenshaw*, 2017 IL App (4th) 150170, ¶¶ 9, 24, 79 N.E.3d 289.

¶ 40 In July 2017, defendant filed a motion for DNA testing, pursuant to section 116-3 of the Code, the subject of this appeal. (725 ILCS 5/116-3 (West 2016)). In the motion, defendant asserted his innocence. Defendant stressed the trial court's conviction was based on credibility and not physical evidence. Defendant maintained the testing would prove he was not in H.H.'s bed, proving his innocence. Defendant stated DNA testing of the hair collected by the crime lab from the bedding had the potential to be relevant to defendant's actual-innocence

- 12 -

claim; if the hair did not match defendant's DNA "it would stand alone, rather than being weighed against other forensic evidence."

¶ 41     The trial court dismissed defendant's motion. The court found defendant's motion was untimely or improperly filed.

¶ 42     This appeal followed.

¶ 43                                    II. ANALYSIS

¶ 44     Section 116-3 of the Code allows a criminal defendant to seek additional forensic testing of evidence secured for the trial that resulted in his or her conviction. 725 ILCS 5/116-3(a) (West 2016). A defendant does so by filing a written motion in the trial court that convicted him or her. *Id*. To obtain the sought-after testing, a defendant, in a written motion, must make a *prima facie* case showing "(1) identity was the issue in the trial or guilty plea which resulted in his or her conviction; and (2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." *Id.* § 116-3(b); see also *People v. Harper*, 2019 IL App (4th) 180160, ¶ 14, 124 N.E.3d 589. Relief shall be allowed upon a finding "(1) the result of the testing has the scientific potential to produce new, noncumulative evidence (i) materially relevant to the defendant's assertion of actual innocence *** even though the results may not completely exonerate the defendant ***; and (2) the testing requested employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116-3(c) (West 2016).

¶ 45     Absent an evidentiary hearing, we review *de novo* a trial court's denial of a section 116-3 motion for forensic testing. *People v. English*, 2013 IL App (4th) 120044, ¶ 14, 987 N.E.2d 1058. We note we are not bound by the trial court's reasoning for its dismissal or

- 13 -

denial of the motion but may affirm the judgment on any ground in the record. *Id.*

¶ 46        Defendant contends the trial court erred in dismissing his motion. Defendant argues, contrary to the court's order, his motion was neither untimely nor improperly served. He further contends he has presented a *prima facie* case showing identity was the issue at trial and the chain of custody was sufficient. Defendant concludes, because identity was the issue at trial, the evidence sought is materially relevant to his assertion of actual innocence as testing results could lead to the identification of someone else as the alleged offender.

¶ 47        The State disputes the defendant's contention the dismissal of the motion was erroneous but concedes a number of defendant's claims of error. The State agrees the trial court erred by finding defendant's motion was untimely or improperly served. The State further agrees defendant made a *prima facie* case that identity was an issue at trial and a sufficient chain of custody exists. The State argues, however, the dismissal is proper as further testing had no potential to produce new, noncumulative evidence materially relevant to defendant's claim he did not assault his daughter.

¶ 48        For purposes of this appeal, we accept the State's concessions and turn to the question of whether the requested testing has the potential to produce new, noncumulative evidence materially relevant to defendant's actual-innocence defense. Evidence that is "materially relevant" to a claim of actual innocence is evidence that tends to "significantly advance that claim." *People v. Savory*, 197 Ill. 2d 203, 213, 756 N.E.2d 804, 810-11 (2001). In determining whether evidence is materially relevant, we must evaluate the evidence from trial as well as the evidence the defendant seeks to test. *People v. Johnson*, 205 Ill. 2d 381, 396, 793 N.E.2d 591, 601 (2002).

- 14 -

¶ 49 Defendant relies on three cases to show "where identification is at issue and absent an admission, a defendant should be given the opportunity to have DNA evidence tested even where other evidence strongly points toward his guilt": *People v. Hockenberry*, 316 Ill. App. 3d 752, 757, 737 N.E.2d 1088, 1092 (2000); *People v. Shum*, 207 Ill. 2d 47, 65-66, 797 N.E.2d 609, 620 (2003); and *People v. Rokita*, 316 Ill. App. 3d 292, 302, 736 N.E.2d 205, 212 (2000). Defendant thus argues because he proved identification is an issue and there has been no in-court admission of guilt, he has proved the "materially relevant" element. We note defendant asserts his admissions to police officers is inadequate as he was under the influence of medication and he maintained his innocence at trial.

¶ 50 To find as defendant suggests would negate the "materially relevant" analysis under section 116(c) when a *prima facie* case is made on the issue of identity. When reading a statute, we must give each word, clause, and sentence a reasonable meaning and, if possible, not render any part of the statute superfluous. *People v. Jackson*, 2011 IL 110615, ¶ 12, 955 N.E.2d 1164. Defendant's proposal would result in our rendering subsection (c) superfluous. None of the cases cited by defendant support our doing so. Indeed, none hold proof of material relevance is unnecessary when the identity element is satisfied and the defendant has not admitted at trial to the offense. Moreover, none can be interpreted as supporting the contention. In the cases relied on by defendant, the presence of semen was used to convict the defendants and DNA testing was either unavailable or unable to exclude the defendants as the perpetrators. In *Hockenberry*, the defendant sought DNA analysis of semen found in the victim. *Hockenberry*, 316 Ill. App. 3d at 754. At the defendant's trial, evidence of semen was presented and the State's expert testified defendant could not be eliminated as a possible source of the semen. *Id.* 756-57. In *Shum*, the

defendant was convicted in 1984 with, in part, evidence that a rape kit was collected and the sample tested positive for semen. *Shum*, 207 Ill. 2d at 54, 66. In *Rokita*, the defendant was convicted of a 1993 sexual assault with evidence of the presence of semen but, due to an older procedure, testing failed to find the presence of defendant's DNA. *Rokita*, 316 Ill. App. 3d at 295, 302. Here, in contrast, no physical evidence was used to convict or identify defendant.

¶ 51 That identity is an issue does not mean the sought-after testing will advance the defendant's claim of actual innocence. Here, identity is an issue because defendant denied, at trial, he committed the offense (see *Hockenberry*, 316 Ill. App. 3d at 757) and the State conceded as much. The results of the sought-after testing will not, however, advance defendant's claim of innocence. From his *pro se* motion to his appeal, defendant raised two possible ways the sought-after evidence would advance his claim. In his *pro se* motion, defendant asserted evidence would show he did not commit the crime as there would be no physical evidence he was in the bed. However, the finding of guilt followed a trial in which *no* physical evidence was presented to prove defendant was in H.H.'s bed. At that trial, evidence was presented showing defendant had used towels to line the bedding and condoms during the assaults. Evidence also showed defendant admitted at trial to being in H.H.'s room after he got off work at 11 p.m. on February 8, 2009. Given this evidence, when considered with the admissions to the police, the voice recording, and Stephanie's identification of defendant on the recording, we are convinced the absence of defendant's DNA on the hairs collected in H.H.'s bed would not "significantly advance" (see *Savory*, 197 Ill. 2d at 213) defendant's claim of actual innocence.

¶ 52 The second potential way the sought-after evidence would advance his claim, according to defendant, is that the testing could reveal DNA from another source, identifying

another person as the possible offender. We disagree. That another individual's hair or DNA could be found in H.H.'s bed is not relevant to H.H.'s claim defendant entered her bedroom on February 9, 2009, and sexually assaulted her. H.H. identified her assailant as her father, someone she had known her entire life. The identification was supported by the evidence at trial, including defendant's statements to the police and Stephanie's testimony regarding the voice recording and defendant's relationship with H.H. H.H.'s identification would not be undermined by the existence of another individual's DNA in her bed.

¶ 53                                III. CONCLUSION

¶ 54           We affirm the trial court's judgment.

¶ 55           Affirmed.