# Illinois Official Reports

## Appellate Court

---

### *People v. Perez*, 2016 IL App (3d) 130784

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JESSE R. PEREZ, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-13-0784 |
| Filed | July 21, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 08-CF-2446; the Hon. Carla Alessio-Policandriotes, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier and Patrick Cassidy, both of State Appellate Defender's Office, of Chicago, for appellant.<br><br>James Glasgow, State's Attorney, of Joliet (Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE LYTTON delivered the judgment of the court, with opinion.<br>Presiding Justice O'Brien and Justice Holdridge concurred in the judgment and opinion. |

**OPINION**

¶ 1　　Defendant, Jesse R. Perez, appeals from the Will County trial court's order denying his motion for forensic testing. We reverse the judgment of the trial court and remand for forensic testing on the evidence identified in defendant's motion.

¶ 2　　　　　　　　　　　　　　　　FACTS

¶ 3　　Defendant was charged by indictment with two counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2008)). The indictment alleged that defendant committed an act of sexual penetration on M.G. The matter proceeded to a jury trial on March 12, 2012.

¶ 4　　M.G.—nine years old at the time of trial—testified that she was six years old when the incident in question took place. She testified that defendant was supposed to take her to his brother's house so that M.G. could play with the children of defendant's brother. Instead, M.G. testified, defendant took her to his own house. Once there, defendant instructed her to pull her pants down. M.G. testified that defendant then touched her "private" with his penis. M.G. testified that defendant put his penis inside her and "was going like forward and backward." After defendant removed his penis, he put his tongue on her "private." M.G. testified that defendant then put his penis in her "poop hole."

¶ 5　　M.G. testified that, afterward, she went to the bathroom. Defendant tried to wash M.G.'s underwear because there was blood on them. After washing the underwear with soap and water, defendant gave the still-wet underwear back to M.G. and instructed her to put them back on. Defendant took M.G. back to the house where M.G. lived with her mother (Judith), aunt, and grandparents. M.G. testified that before she and defendant entered the house, "he said if I tell he's going to F me up." M.G. then took a bath, and Judith washed her clothes.

¶ 6　　When defendant left the house that night, M.G. told Judith what had transpired. M.G. and her mother met with defendant's half-sister, Perla Perez, the next day at the library. M.G. told Perla what defendant had done. M.G. testified that a couple days later, she went to a hospital, where a doctor looked at her "private parts."

¶ 7　　Judith testified that she was nine months pregnant with defendant's child at the time of the incident. She testified that defendant and M.G. left her home around 5 or 6 p.m. and returned around 8:30 p.m. When M.G. and defendant returned to the house, Judith noticed that M.G. was unusually quiet. She had not been like that earlier in the day. Judith testified that M.G. went straight to sleep after taking a bath and that defendant was still in the house at that time. After defendant left the house, Judith went to the bathroom to pick up M.G.'s clothes. She noticed that there was blood on M.G.'s underwear. Judith knew the underwear to be the same that M.G. had been wearing earlier in the day. Judith put the underwear "on the side" and went back to her room. M.G.'s grandmother later discovered the underwear in the bathroom and gave them to Judith.

¶ 8　　M.G. woke up around midnight that night, at which point Judith asked her what happened. Judith testified that M.G. told her that defendant had hurt her "private area." M.G. told Judith that defendant had told her to remove her clothes. M.G. told Judith that when she was in the bed she felt pain in her private area, that she screamed and cried for defendant to stop, and that defendant spit "down there."

¶ 9        After M.G. told Judith what defendant had done, Judith called Perla. She met with Perla the next day at the library where M.G. told Perla what defendant had done. Judith testified that M.G.'s description to Perla was the same as the description M.G. had provided the previous night. Perla then arranged for a ride to St. Joseph's hospital in Joliet. At the hospital, Judith delivered the underwear from the bathroom to a nurse. Judith also noticed blood on the underwear that M.G. was wearing. Upon instructions from doctors at St. Joseph's, Judith took M.G. to a hospital in Naperville the next day.

¶ 10      Doctor Dan Magdziarz examined M.G. in the emergency room. He observed a two-millimeter abrasion on the opening of M.G.'s vagina. Doctor George Kuburov examined M.G. three days after the alleged incident. He observed "a tear through the hymen that extended down into the lower part of [M.G.'s] genital area." He also observed M.G.'s hymen to be swollen, red, and hemorrhagic.

¶ 11      Megan Hoholik testified that she was on duty as an emergency room nurse when M.G. came to the hospital. She conducted a sexual assault evidence collection kit on M.G. As part of the kit, Hoholik collected a pair of underwear, which was described as the underwear M.G. was wearing at the time of the alleged assault. These were admitted at trial as People's exhibit No. 10. She also collected the pair of underwear that M.G. was wearing the day of the hospital visit. These were admitted at trial as People's exhibit No. 11.

¶ 12      Forensic biologist William Anselme testified that he worked on the sexual assault kit performed on M.G. The kit was admitted into evidence as People's exhibit No. 9. The kit contained a blood standard from M.G., vaginal swabs, oral swabs, anal swabs, head hair combings, fingernail scrapings, and two pairs of underwear. The kit also contained a hospital report detailing M.G.'s version of events and a police report, each of which Anselme used to determine what tests he should run.

¶ 13      Anselme ran tests on the swabs and the underwear to determine if semen or saliva was present. Those tests were negative. Anselme also used tape to collect hair and fibers from the underwear. He did not subsequently test the tape for any microscopic evidence because that was outside his area of expertise. He agreed that the tape would still be testable. Anselme observed blood on the vaginal swab but did not determine the origin of the blood. Anselme conducted no DNA tests on any of the evidence collected.

¶ 14      The defense did not present any evidence in its case-in-chief. In closing arguments, defense counsel emphasized the lack of physical evidence directly linking defendant to the assault. Counsel argued: "[S]omething happened, but how do you know [defendant] did it? What corroborates that?" Counsel also argued that certain inconsistencies in M.G.'s recitations of her version of events rendered her incredible.

¶ 15      The jury found defendant guilty on both counts of predatory criminal sexual assault of a child. The trial court sentenced defendant to terms of 49 and 38 years' imprisonment, to be served consecutively. This court affirmed defendant's convictions and sentences on direct appeal. *People v. Perez*, 2014 IL App (3d) 120837-U.

¶ 16      While defendant's direct appeal was pending, he filed a *pro se* motion for forensic testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2012)). In the motion, defendant requested forensic DNA testing on the blood found on the two pairs of underwear in the sexual assault kit and on any hair recovered from Anselme's taping. Defendant argued that identity was the issue at his trial and that the evidence on which he sought testing had been collected by the State and remained in the State's control. He also

argued: "Chain of custody is presumed because all evidence was collected by [p]olice officers and has been in State control ever since." In an attached affidavit, defendant maintained his innocence and provided the names of registered sex offenders acquainted with Judith's sisters and having "full access" to M.G.

¶ 17    The State moved to dismiss defendant's motion, arguing that defendant had failed to show that testing had the potential to produce new evidence of his innocence. The trial court granted the State's motion.

¶ 18                                             ANALYSIS

¶ 19    On appeal, defendant argues that the trial court erred in denying his motion for forensic testing. Because defendant (1) has made a *prima facie* case that identity was at issue at trial, (2) has made a *prima facie* case that the evidence sought to be tested was subjected to a sufficient chain of custody, and (3) has shown that the testing has the potential to produce evidence relevant to his claim of actual innocence, he has complied with section 116-3 and is entitled to have forensic testing conducted on the evidence identified in his motion.

¶ 20    Section 116-3 provides that "[a] defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of *** forensic DNA testing." 725 ILCS 5/116-3(a) (West 2012). To prevail on his or her motion, a defendant must present a *prima facie* case that:

> "(1) identity was the issue in the trial which resulted in his or her conviction; and
>
> (2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(b)(1), (2) (West 2012).

When a defendant makes such a *prima facie* case, the trial court shall allow testing only where, among other things, "the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the results may not completely exonerate the defendant." 725 ILCS 5/116-3(c)(1) (West 2012). We review *de novo* the denial of a motion for forensic testing. *People v. Stoecker*, 2014 IL 115756, ¶ 21.

¶ 21                                           I. Identity

¶ 22    Defendant maintains that identity was at issue in his trial, pointing out that M.G. was the only eyewitness against him, there was no physical evidence linking him to the offense, and he always maintained his innocence. In arguing that identity was not at issue, the State emphasizes the sheer weight of evidence presented against defendant. The State points out that M.G. was credible and consistent in her story and that the evidence was more than sufficient to sustain a conviction.

¶ 23    In the recent case of *People v. Grant*, 2016 IL App (3d) 140211, ¶¶ 18-22, we explicitly held that the question of whether identity was at issue at trial is unrelated to the amount or nature of evidence against a defendant. We held that a defendant's denial at trial that he committed the offense was sufficient to put identity at issue. *Id*. ¶ 18; see also *People v. Urioste*, 316 Ill. App. 3d 307, 316 (2000) ("[O]ur legislature wanted postconviction forensic testing to occur only in those cases where such testing could discover new evidence at sharp odds with a previously rendered guilty verdict *based upon criminal acts that the defendant*

*denied having engaged in.*" (Emphasis in original.)). As it does here, the State in *Grant* emphasized the quantum of evidence against the defendant. *Grant*, 2016 IL App (3d) 140211, ¶ 21. We responded to that argument: "Although the State argues that identity was not disputed at trial, in actuality, its argument is that defendant is not entitled to forensic testing because the State prevailed at trial given the evidence presented on the disputed issue of identity. That is not the test here." *Id.*

¶ 24    The State argues that *Grant* does not control the present case because defendant here did not testify and therefore did not deny committing the crime at trial. In *Grant*, we stated that "[t]he only question is whether defendant disputed being the person who committed the crime." *Id.* ¶ 22. Thus, while we held that the *Grant* defendant's denial at trial was *sufficient* to put identity at issue, we did not hold that a defendant's testimony was *necessary*. Indeed, we would be reticent to interpret section 116-3(b)(1) as requiring a criminal defendant to testify in his own defense. See, *e.g.*, *People v. Price*, 345 Ill. App. 3d 129, 141 (2003) (finding identity at issue where defendant did not testify at trial). While the physical evidence and expert testimony showed that M.G. had been the victim of an assault, defense counsel's theory of the case was that defendant had not been the perpetrator.

¶ 25    The State cautions that finding identity to be at issue at defendant's trial would be to "conclude the identity of the perpetrator is necessarily at issue whenever a defendant proclaims his or her innocence in a criminal proceedings [*sic*], including where the victim positively and unimpeachably identified the perpetrator in sworn testimony." Initially, we again point out that the State's reference to the victim's positive and unimpeachable identification is an irrelevant reference to the strength of the evidence. See *supra* ¶ 23. Moreover, the State neglects that a defendant may maintain his innocence based on any number of theories aside from identity. For example, a defendant may argue that the State cannot prove he had the requisite *mens rea* or may not be able to prove the *corpus delicti*. A defendant may also assert a number of affirmative defenses, such as self-defense, mistake, or consent. Thus, contrary to the State's position, under our ruling identity is not automatically at issue any time a defendant maintains his innocence.

¶ 26                            II. Chain of Custody

¶ 27    Defendant next contends that he made a *prima facie* case that the evidence on which he sought forensic testing was subject to a sufficient chain of custody. He argues that a showing that the evidence was in the State's possession at trial is sufficient to make such a *prima facie* case. The State disagrees, arguing that the evidence in question was in a number of different hands in various locations prior to being collected by the police, thus rendering it unsuitable for DNA testing.

¶ 28    Our supreme court has held that a defendant's assertion that the evidence sought to be tested has remained in the State's control since the time of trial is sufficient to establish a *prima facie* case of sufficient chain of custody under section 116-3. *People v. Johnson*, 205 Ill. 2d 381, 394 (2002). As the court explained in *Johnson*, such a standard is necessary because a defendant will not have access to information regarding the actual chain of custody:

> "Though the State contends that the defendant has presented no evidence of the kit's location since his 1984 trial, such evidence would not be available to the defendant. The [sexual assault] kit, as a piece of real evidence admitted at trial, would have remained in the custody of the circuit court clerk after the defendant's conviction." *Id.*

In *People v. Shum*, 207 Ill. 2d 47, 66 (2003), the supreme court explained that the introduction of evidence at trial is itself *prima facie* evidence that the evidence has been subjected to a sufficient chain of custody under section 116-3. *Id.* ("The [sexual assault] kit was entered into evidence, so it would have remained in the possession of the circuit court clerk after defendant's conviction.").

¶ 29    Following *Johnson*, the First District in *People v. Bailey*, 386 Ill. App. 3d 68, 70 (2008), found that the defendant had made a *prima facie* case of chain of custody where he alleged "that the evidence he sought to have tested was admitted into evidence, was in the circuit court clerk's custody, had been subject to a sufficient chain of custody." *Id.* The court agreed that the defendant's assertions had been conclusory but found that case law suggested they were sufficient. *Id.* at 75. Similarly, the Second District in *People v. Sanchez*, 363 Ill. App. 3d 470, 478 (2006), found sufficient the defendant's allegation that "since the conclusion of [his] trial, the evidence to be tested has been in [the] continuous possession of law enforcement agencies, thereby satisfying the requirement of a sufficient chain of custody to establish the integrity of the evidence." (Internal quotation marks omitted.) *Id.*; see also *People v. Travis*, 329 Ill. App. 3d 280, 285 (4th Dist. 2002) ("It asks too much to require petitioning defendant in these cases to plead and prove proper chain of custody at the outset, for the evidence at issue will undoubtedly have been within the safekeeping of the State, not the defendant.").

¶ 30    In the present case, the evidence on which defendant seeks forensic testing is blood and tapings from two pairs of underwear. Each of those pairs of underwear was admitted as evidence at trial and had thus presumably remained in the possession and control of the State. See *Shum*, 207 Ill. 2d at 66. Indeed, defendant asserted in his petition that the evidence was collected by police officers and has presumably been within State control ever since. To require defendant to provide any more specific information than this, information he would not be privy to, would render it nearly impossible for a defendant to ever obtain forensic testing. See *Johnson*, 205 Ill. 2d at 394.

¶ 31    The State concedes that it takes no issue with the handling of the evidence in question after it came into police control. However, the State argues that the two pairs of underwear were in too many hands and too many locations to be considered reliable evidence. Specifically, the State points out that People's exhibit No. 10, the underwear worn by M.G. at the time of the assault, was removed at defendant's home, washed with soap, given to Judith, and later found by M.G.'s grandmother on the bathroom floor.

¶ 32    We are unaware of any case in which the chain of custody requirement of section 116-3 has been interpreted as applying to evidence prior to it being taken into custody. The State has cited no cases that would support such an interpretation. Indeed, cases analyzing chain of custody for section 116-3 purposes have universally dealt with the chain of custody from trial through the filing of the motion for forensic testing. See *supra* ¶¶ 28-29. To the extent that the State's interpretation would ever be tenable, it would certainly not be so where, as here, the evidence sought to be tested was introduced into evidence at trial by the State. Once the State has introduced evidence at trial and used that evidence to procure a conviction, we will not entertain an argument from the State that that evidence should now be considered too tainted to be considered. See *People v. Regains*, 187 Ill. App. 3d 713, 716 (1989).

¶ 33                                    III. Relevance of Testing

¶ 34    Finally, defendant argues that the requested testing has the potential to produce evidence relevant to his claim of actual innocence. He maintains that if testing on the blood or tapings reveals DNA that does not match himself or M.G., such a result would constitute new evidence of his innocence. The State rejects this argument, insisting that "any result showing DNA other than that of defendant and the victim would be irrelevant."

¶ 35    Section 116-3(c)(1) makes clear that forensic testing need only have the potential to produce relevant evidence; it is not required that any potential new evidence completely exonerate a defendant. 725 ILCS 5/116-3(c)(1) (West 2012). Our supreme court has held that, under section 116-3, materially relevant evidence "is simply evidence which tends to significantly advance that claim [of actual innocence]." *People v. Savory*, 197 Ill. 2d 203, 213 (2001); see also *Price*, 345 Ill. App. 3d at 134 ("[W]hile a court must consider the exculpatory potential of a favorable result [citation], it is irrelevant whether the test will likely be favorable or not [citation]. 'If testing is otherwise warranted, it should be authorized, no matter how slight the chance that it will, in fact, yield a favorable result.' " (quoting *Anderson v. State*, 831 A.2d 858, 867 (Del. 2003))).

¶ 36    In *Johnson*, the supreme court noted that the State had "presented a strong, but largely circumstantial, case; the only direct evidence of the defendant's guilt came from [one victim's] identification." *Johnson*, 205 Ill. 2d at 396. Despite the strong circumstantial evidence and victim identification, the court allowed the requested testing, reasoning that "[a] favorable result on a DNA test of the [sexual assault] kit would significantly advance the defendant's claim that he did not rape [the victim.]" *Id.* at 396-97. The court concluded: " 'If the available DNA evidence is capable of supporting such determination, there is no valid justification to withhold such relief if requested on postconviction review.' " *Id.* at 397 (quoting *People v. Dunn*, 306 Ill. App. 3d 75, 81 (1999)).

¶ 37    In the present case, the requested testing has the potential to produce new evidence materially relevant to defendant's assertion of actual innocence, even if the results may not completely exonerate defendant. See 725 ILCS 5/116-3(c)(1) (West 2012). A result showing the presence of DNA not matching M.G. and not matching defendant would be quite relevant to defendant's claim of actual innocence. Because there was no allegation that M.G. was assaulted by more than one person, the presence of third-party DNA would be antithetical to the State's theory of the case. The case at hand is analogous to *Johnson* in that, despite the State's strong evidence, no physical evidence against defendant was ever produced.

¶ 38    To be sure, a result showing the presence of third-party DNA might not completely exonerate defendant. If such a result were raised in a postconviction claim of actual innocence, the State would be free to argue that the probative value of the evidence is mitigated by the chain of custody issues it has discussed here. See *supra* ¶ 31. However, we need not decide if there is potential for defendant to be completely exonerated. See 725 ILCS 5/116-3(c)(1) (West 2012). We also need not express any opinion on the potential merits of a future actual innocence claim. *Grant*, 2016 IL App (3d) 140211, ¶ 28 ("While defendant's claim could potentially be bolstered by a favorable forensic testing result, whether the claim would be bolstered enough to meet that standard is ultimately a question for a future trial court.").

¶ 39                              CONCLUSION

¶ 40        The judgment of the circuit court of Will County is reversed, and the cause is remanded for the trial court to enter an order for forensic testing.


¶ 41        Reversed and remanded with directions.