**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 170608-U

Order filed May 13, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0608 Circuit No. 09-CF-1362 |
| DOUGLAS F. CANAS JR., | ) ) ) | |
| Defendant-Appellant. | ) ) | Honorable Sarah F. Jones, Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justices Carter and Wright concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) Defendant is entitled to forensic testing of pubic hair combings in sexual assault kit; (2) forensic testing of victim's outerwear does not have potential to yield materially relevant evidence; (3) any error in the circuit court's denial of counsel was harmless.

¶ 2     Defendant, Douglas F. Canas Jr., appeals following the denial of his motion for postconviction forensic testing, filed pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2016)). He argues that his motion satisfied each of the required elements under that section, and that the Will County circuit court thus erred

in denying his request for forensic testing. Defendant also contends that the court committed error in finding it was without authority to appoint counsel for him. We affirm in part, reverse in part, and remand the matter for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4        On June 25, 2009, the State charged defendant with two counts of criminal sexual assault (720 ILCS 5/12-13(a)(2) (West 2008)). The court commenced a jury trial beginning on December 6, 2011.

¶ 5        The victim, Gloria Shaw, testified that on September 19, 2008, she worked into the early morning hours of September 20. After work, she and some coworkers went to a park to "have a few drinks[ ] and play basketball." Shaw drove her car and did not have any passengers. She estimated that there were eight or nine coworkers from her place of employment at the park, though she did not know all of them. Shaw recalled that defendant, Donte Gant, and Hassan Ware, all of whom she knew from work, were at the park. She was the only woman there.

¶ 6        Shaw testified that she had two drinks then "started playing basketball with the guys." During the game, she began to feel dizzy and nauseous. Shaw testified that she had to urinate, so she went to the playground area, rather than a nearby porta-potty, in order to obtain more privacy. She climbed to a higher level of the playground equipment and urinated through the grating. She testified that as she attempted to pull her pants up, she "accidentally slid down the slide." Shaw began to walk back to the basketball court but began throwing up. She estimated that she had consumed two mixed liquor drinks and one beer while at the park.

¶ 7        The next thing Shaw remembered was that she "woke up to the pain of a man penetrating [her] from behind in [her] vaginal area." She was in the backseat of a car, though she could not determine if it was her own. Her pants and the boxer shorts she was wearing had been pulled

down. She remembered hearing Gant's voice "describing [her] vaginal area." However, on redirect, Shaw testified that she heard Gant's voice and felt him touching her vagina prior to feeling a penis in her vagina. Shaw testified that she looked over her shoulder and looked her assailant "dead in the face." She identified defendant as the person she saw. Shaw testified that when she saw him, defendant removed his penis. She testified that she then "passed back out."

¶ 8 Shaw next remembered waking up, fully clothed, in the driver's seat of her own car. She called her friend, Arele Thompson, and told her what had happened. Thompson testified that Shaw was crying and slurring her words. Thompson testified that Shaw described the situation and said: "I just woke up [and] a Mexican was fucking me."

¶ 9 Shaw then tried to drive home but was "falling in and out of consciousness" while on the interstate. She exited the interstate and fell asleep in her car for seven or eight hours. When she woke up, she went home. At home, Shaw noticed that her face had been written on with a black marker. Shaw put the pants and shirt she was wearing into a plastic bag. It was at that time that Shaw noticed the belt she had been wearing was torn and "barely hanging on by a thread."

¶ 10 Shaw testified that she went to the emergency room and indicated that she had been raped. A nurse performed a sexual assault kit that included collection of the boxer shorts Shaw had been wearing. The nurse also collected pubic and head hair combings. Shaw spent that night in the hospital.

¶ 11 The next day, Shaw went to the Bolingbrook Police Department. She brought her pants, belt, and shirt from the day of the incident and turned those over to police. Shaw was later shown a six-person photographic lineup by Will County Sheriff's Detective Anthony Policandriotes. She was unable to identify anyone in that lineup as her assailant. Policandriotes pointed to the

photograph of defendant and asked Shaw if he was the perpetrator, but Shaw responded that she was not sure.

¶ 12        Policandriotes testified that he showed Shaw a six-person photographic lineup, which included a photograph of defendant. He showed Shaw the lineup on December 5, 2008. Shaw was unable to identify anyone in the lineup. Policandriotes then pointed to the photograph of defendant and asked Shaw, "[Y]ou sure this isn't the guy?" According to Policandriotes, Shaw's response was "[N]o, no, it's not."

¶ 13        Nurse Pamela Hric testified that she examined Shaw in the emergency room and performed a sexual assault kit. Hric collected Shaw's boxer shorts, as well as oral, vaginal, and cervical swabs. She also collected fingernail clippings, and head and pubic hair combings. She turned the sexual assault kit over to the Will County Sheriff's Department. The sexual assault kit became People's exhibit No. 9, which contained People's exhibit Nos. 5, 10, 11, 12, 13, 14, and 15.

¶ 14        Forensic scientist Sarah Owen testified that she examined the sexual assault kit. She testified that her testing indicated the presence of semen on the vaginal swab. Owen also discovered the presence of semen on the pubic hair combings, as well as the "crotch area" of the boxer shorts. The pubic hair combings were marked as People's exhibit No. 14. Testing on the semen found on the vaginal swab did not reveal a DNA profile. The semen on the boxer shorts was found to be a match to defendant's DNA.

¶ 15        Defendant's first witness was Jesse Garcia. Garcia testified that he worked with defendant and Shaw. Garcia was working on the night in question; when his shift ended at approximately 3 a.m., he drove to a park to play basketball with some coworkers. He testified that 10 to 15 people were at the park at one time. Garcia recalled that at some point, Shaw

climbed to the top of the slide and announced that she was going to "pee down the slide." Garcia testified that Shaw slid down the slide then pulled her pants up. Garcia left the park 30 minutes later while seven or eight people remained.

¶ 16 Gant testified that he drove to the park by himself. Gant played basketball with defendant, Shaw, Ware, "and a couple of other coworkers." Gant testified that after playing basketball, Shaw told him "that she was going to go and use the bathroom down the slide." Gant stated that Shaw was waving her hands in an attempt to get everyone's attention. Shaw went up the slide then came down with her pants off.

¶ 17 Gant testified that Shaw returned to her car between 6:30 and 7 a.m., approximately two hours after the incident on the slide. Gant observed that Shaw was stumbling around and could not walk straight. He testified that Ware took the keys from Shaw's ignition. Shaw eventually lay down in the backseat of her car. Gant testified that while Shaw was asleep defendant wrote on her face with a marker. Gant denied that he or defendant pulled down Shaw's pants. Gant left the park around 7:30 a.m. Defendant and Ware remained at the park.

¶ 18 Ware testified that he drove to the park with defendant. He recalled that 10 people were playing basketball at one time, including himself, defendant, and Shaw. They played for "a couple of hours." Ware testified that while at the park, Shaw "stood on top of the slide and got everybody's attention and urinated on the slide." Ware testified that Shaw pulled her pants down to her knees, lost her balance, and fell or slid down the slide.

¶ 19 When Shaw later tried to leave in her car, Ware would not let her because he believed she was intoxicated. Shaw then lay down in the backseat of her car and fell asleep. Defendant drew on her face with a marker. Ware testified that he left the park with defendant between 7:30 and

8 a.m. He never saw Shaw and defendant near the porta-potty in the park, nor did he see them together prior to defendant writing on Shaw's face.

¶ 20        Defendant testified that he rode with Ware to the park after getting off work. Defendant knew Shaw from work. Defendant played basketball with a group that included Shaw for 45 minutes or an hour. Shaw left the game when she got injured. He next encountered Shaw later when he was using the porta-potty. Shaw entered the porta-potty and began to kiss defendant and "grab [his] privates." Defendant testified that Shaw "masturbate[d] [his] penis" until he ejaculated. Defendant and Shaw then switched positions within the porta-potty so Shaw could use the toilet. Defendant told Shaw they could not have sexual intercourse because he did not have a condom. They then left the porta-potty.

¶ 21        Defendant testified that a while later, Shaw attempted to get everyone's attention and urinate down a slide, but she fell down. Defendant recalled that Shaw entered the backseat of her car and fell asleep. Defendant testified that he and Gant wrote on Shaw's face while she slept. He denied taking off her pants or putting his penis in her vagina.

¶ 22        After twice sending notes to the court indicating that it could not reach a verdict, the jury ultimately found defendant guilty on both counts. The court sentenced defendant to concurrent terms of six years' imprisonment. This court affirmed defendant's conviction. *People v. Canas*, 2013 IL App (3d) 120687-U.

¶ 23        On May 15, 2017, defendant filed a motion for postconviction forensic testing pursuant to section 116-3 of the Code (725 ILCS 5/116-3 (West 2016)). Specifically, defendant requested DNA testing on Shaw's belt, her shirt, her pants, and the sexual assault kit. Defendant alleged that the testing had the potential to reveal, *inter alia*, "touch DNA" from Shaw's clothing. Regarding chain of custody, defendant alleged that the evidence in question had been in

continuous possession of law enforcement agencies. He attached multiple exhibits to his motion detailing the chain of custody of that evidence leading up to trial.

¶ 24    After the State filed a motion objecting the testing, the circuit court held oral arguments on the matter. Defendant appeared in court in the custody of the Illinois Department of Corrections. Following his argument, defendant asked if the court would appoint counsel. The court responded that it did "not have the authority to appoint *** legal [c]ounsel." The court denied defendant's motion in full.

¶ 25                                   II. ANALYSIS

¶ 26    On appeal, defendant contends that the circuit court erred in denying his motion for postconviction forensic testing with respect to the following items: (1) Shaw's shirt, (2) Shaw's belt, (3), Shaw's pants, and (4) the pubic hair combings found in the sexual assault kit. With respect to the remaining items within the sexual assault kit, defendant has abandoned his request for testing. Separately, defendant argues that the court erred in that it did not exercise its discretion when denying his request for counsel.

¶ 27                                A. Forensic Testing

¶ 28    Section 116-3 provides that "[a] defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of *** forensic DNA testing." 725 ILCS 5/116-3(a) (West 2016). To prevail on his or her motion, a defendant must present a *prima facie* case that:

> "(1) identity was the issue in the trial or guilty plea which resulted in his
>     or her conviction; and

(2) the evidence to be tested has been subject to a chain of custody

sufficient to establish that it has not been substituted, tampered with, replaced, or

altered in any material aspect." *Id.* § 116-3(b)(1), (b)(2).

If a defendant succeeds in making the *prima facie* case, the circuit court shall allow the testing

upon a determination that "the result of the testing has the scientific potential to produce new,

noncumulative evidence *** materially relevant to the defendant's assertion of actual innocence

*** even though the results may not completely exonerate the defendant." *Id.* § 116-3(c)(1). The

court must also determine that "the testing requested employs a scientific method generally

accepted within the relevant scientific community." *Id.* § 116-3(c)(2).

¶ 29　　　　On this appeal, the State contends that defendant failed to satisfy three of the above

required elements. The State argues that the testing requested did not have the potential to

produce evidence materially relevant to defendant's claim of innocence. It also argues that

defendant failed to make a *prima facie* case that identity was the issue at his trial and that the

evidence in question was subject to a proper chain of custody. We review the denial of a motion

for postconviction forensic testing *de novo*. *People v. Kines*, 2015 IL App (2d) 140518, ¶ 25.

¶ 30　　　　　　　　　　　　　　1. Material Relevance

¶ 31　　　　The question of whether forensic testing has the potential to produce evidence materially

relevant to a defendant's claim of actual innocence cannot be answered in the abstract; it requires

consideration of the evidence adduced at trial, as well as the evidence a defendant seeks to test.

*People v. Savory*, 197 Ill. 2d 203, 214 (2001). Evidence is "materially relevant" if it will

significantly advance defendant's claim of actual innocence. *People v. Shum*, 207 Ill. 2d 47, 65

(2003); see also *People v. Gibson*, 357 Ill. App. 3d 480, 489 (2005) ("Thus, although the

evidence against defendant may be strong and compelling, his claim of actual innocence will nevertheless be significantly advanced by a favorable DNA test result.").

¶ 32    Initially, we find that DNA testing on Shaw's shirt, belt, and pants does not have the potential to produce materially relevant evidence. Even assuming that Shaw's assailant must have touched her pants or belt, it is not true that the assailant must have left "touch DNA" from that contact. Thus, if DNA testing determined that defendant's DNA could not be found on those items, it would not be a significantly relevant fact. Further, even the locating of some other male touch DNA on those items would not further defendant's claim of actual innocence. Shaw testified that she had been wearing that clothing all day. In fact, trial testimony shows that she played basketball in those clothes for up to one hour with at least nine other people. As the clothes in questions are outerwear, it would not be particularly surprising to discover one or more other profiles of touch DNA on them. There is no imaginable result on the testing of those items that would significantly advance a claim of innocence.

¶ 33    The same, however, cannot be said for testing on the pubic combings collected as part of the sexual assault kit. Those combings tested positive for the presence of semen, however, those sperm cells were not tested for DNA. If forensic testing revealed the presence of a DNA profile distinct from that of defendant, such a result would significantly bolster defendant's credibility. It would render far more plausible defendant's theory that his semen came in contact with Shaw's boxer shorts during a consensual porta-potty encounter, rather than in the course of a sexual assault.

¶ 34    To be sure, such a result would not completely exonerate defendant. Defendant's DNA, after all, was still found on or in Shaw's boxer shorts. The finding of different DNA in the pubic

combings would also be consistent with Shaw having been assaulted by multiple individuals, including defendant. To that point, the State argues:

> "Even if there was DNA that belonged to someone else, that would not show that defendant was actually innocent. The victim positively identified defendant and defendant's semen was found on the victim's underwear. If there was someone else's DNA found on the items defendant wants tested, it merely means that defendant may not have been the only one who had sexually assaulted the victim."

¶ 35 The Code itself, however, makes clear that evidence need not be completely exonerative in order to rise to the level of material relevance. 725 ILCS 5/116-3(c)(1) (West 2016). Thus, that a positive test "would not show that defendant was actually innocent" is of no particular import. Further, we note that no other person was charged with the sexual assault of Shaw. While Shaw testified that she heard Gant's voice at some point while she was in the car, she gave no indication that Gant also put his penis in her vagina. While there exists a scenario in which the discovery of a second man's DNA does not exonerate defendant, there can be no doubt that such a discovery would significantly advance defendant's cause. Further, the State's hypothesis that Shaw *could have been* assaulted by multiple men—a theory that, if indulged, would seemingly foreclose DNA testing in almost all cases—has been rejected by this court before. *People v. Grant*, 2016 IL App (3d) 140211, ¶ 27.

¶ 36                                              2. Identity

¶ 37 Identity is at issue in a criminal trial when the perpetrator's identity is disputed or in question. See Black's Law Dictionary 151 (10th ed. 2014). Put another way, in the context of a section 116-3 motion, "a defendant must make a *prima facie* showing that there was an issue at

trial as to whether the defendant or somebody else committed the crime." *People v. Hockenberry*, 316 Ill. App. 3d 752, 756 (2000). A defendant makes a sufficient showing that identity was an issue at trial where the trial record reflects that he denied committing the crime. *People v. Urioste*, 316 Ill. App. 3d 307, 316 (2000) ("[O]ur legislature wanted postconviction forensic testing to occur only in those cases where such testing could discover new evidence at sharp odds with a previously rendered guilty verdict *based upon criminal acts that the defendant denied having engaged in*." (Emphasis in original.)).

¶ 38    In *People v. Price*, 345 Ill. App. 3d 129, 130-31 (2003), three witnesses—including the victim and a codefendant—testified that the defendant sexually assaulted the victim. A fourth witness testified that he saw the defendant enter the victim's cell just prior to the sexual assault. *Id.* at 131. The next day, in an interview with a correctional officer, the defendant denied sexually assaulting the victim. *Id.* A rectal swab containing spermatozoa was procured as evidence, but not tested. *Id.* at 132. After being convicted for aggravated criminal sexual assault, the defendant filed a section 116-3 motion seeking forensic testing on that swab. *Id.* The appellate court found that identity was a central issue at trial, stating: "While the occurrence witnesses testified that defendant sexually assaulted the victim, defendant maintained that the witnesses were lying and that he did not engage in any sexual acts with the victim." *Id.* at 141; see also *Shum*, 207 Ill. 2d at 64-66 (identity an issue at trial—despite testimony of an eyewitness familiar with the defendant—where the defendant had "consistently denied involvement in the crimes").

¶ 39    The State argues that "identity was not the central issue at trial." From there the State recaps the evidence, pointing out that Shaw immediately told Thompson she had been assault by "a Mexican" and later identified defendant in court. The State also notes that defendant's DNA

was found in or on Shaw's boxer shorts. Finally, the State points out that this court found the evidence at defendant's trial legally sufficient on direct appeal. See *Canas*, 2013 IL App (3d) 120687-U, ¶ 14.

¶ 40 First, the State's implication that the evidence of defendant's guilt was overwhelming is not supported by the record. While Shaw did identify defendant at trial, she failed to identify him in a photographic lineup. Even after defendant was pointed out to Shaw in the lineup, Shaw affirmatively denied that defendant was her assailant. Moreover, our finding that the evidence in defendant's case was sufficient for this court to affirm his conviction is irrelevant to the present issue.

¶ 41 More broadly, this court has repeatedly stated the question of whether identity was an issue at trial is *not related* to the weight or strength of the evidence at trial. It is merely a question of whether a defendant denies being the person that committed the offense in question. In *Grant*, we explained:

> "[T]he question of whether identity was at issue at trial is not tied to the amount of evidence the State presents against a defendant. See *Urioste*, 316 Ill. App. 3d at 316. Although the State argues that identity was not disputed at trial, in actuality, its argument is that defendant is not entitled to forensic testing because the State prevailed at trial given the evidence presented on the disputed issue of identity. That is not the test here. See *id.*
>
> *** [T]he present question is not whether the evidence was sufficient, or even if the evidence was closely balanced as to the issue of identity. The only question is whether defendant disputed being the person who committed the

- 12 -

crime. By denying that he committed the offense \*\*\* defendant put the question of identity squarely at issue at trial." *Grant*, 2016 IL App (3d) 140211, ¶¶ 21-22.

¶ 42 Subsequently, in *People v. Perez*, 2016 IL App (3d) 130784, ¶¶ 23-25, we again rejected the State's argument that identity was not an issue at trial because the evidence of identity had been strong. We adhered to the holding in *Grant*, finding that identity is at issue in a case so long as a defendant's theory of the case is that someone else had committed the offense. *Id.* ¶ 24.

¶ 43 Once again, the State argues that identity was not an issue at defendant's trial simply because of the strength of the evidence against defendant. Once again, we reject that argument. In defendant's testimony, he explicitly denied being the person that sexually assaulted Shaw. Identity was therefore an issue in defendant's trial. See *Urioste*, 316 Ill. App. 3d at 316; *Grant*, 2016 IL App (3d) 140211, ¶ 22; *Perez*, 2016 IL App (3d) 130784, ¶ 23.

¶ 44                                    3. Chain of Custody

¶ 45 Our supreme court has held that a defendant's assertion that the evidence sought to be tested has remained in the State's control since the time of trial is sufficient to establish a *prima facie* case of sufficient chain of custody under section 116-3 of the Code. *People v. Johnson*, 205 Ill. 2d 381, 394 (2002). As the court explained in *Johnson*, such a standard is necessary because a defendant will not have access to information regarding the actual chain of custody:

> "Though the State contends that the defendant has presented no evidence of the kit's location since his 1984 trial, such evidence would not be available to the defendant. The [sexual assault] kit, as a piece of real evidence admitted at trial, would have remained in the custody of the circuit court clerk after the defendant's conviction." *Id.*

In *Shum*, 207 Ill. 2d at 66, the court explained that the introduction of evidence at trial is itself *prima facie* evidence that the evidence has been subjected to a sufficient chain of custody under section 116-3. *Id.* ("The [sexual assault] kit was entered into evidence, so it would have remained in the possession of the circuit court clerk after defendant's conviction.").

¶ 46 *Shum* and *Johnson* control the outcome here. The sexual assault kit, which included the pubic hair combings as People's exhibit No. 14, was introduced at defendant's trial. Defendant pointed this out in his motion for testing that the evidence in question had been in continuous custody of the State. He thus made a *prima facie* case of chain of custody sufficient under section 116-3.

¶ 47 We note that the State argues that the chain of custody stipulation by the parties at trial "was fine to show chain of custody at trial, but it was not sufficient to meet the above section of the statute for DNA testing." Not only does this argument ignore our supreme court's holdings in *Johnson* and *Shum*, but it would create a plainly inequitable scenario in which the chain of custody of evidence is sufficient when the State wishes to use that evidence against a defendant, but insufficient when a defendant wants to use that same evidence to exonerate himself. Further, section 116-3 only requires a defendant to make a *prima facie* showing. Our conclusion does not foreclose the possibility that the State may later dispute chain of custody at any postconviction proceedings that might result from the requested testing.

¶ 48 In summary, we find that forensic testing on Shaw's shirt, pants, and belt does not have the potential to result in materially relevant evidence. *Supra* ¶ 31. For that reason, we affirm the circuit court's denial of defendant's motion with respect to those three pieces of evidence. However, we find that defendant has satisfied each element of section 116-3 with respect to the pubic hair combings found in the sexual assault kit introduced at trial. For that reason, we reverse

the court's judgment with respect to that piece of evidence, and remand the matter so that the court may order the requested testing on the pubic hair combings.

¶ 49                                              B. Denial of Counsel

¶ 50        Because we affirm the court's judgment in part, it is necessary to discuss the second issue raised by defendant. He argues that while he had no right to counsel under section 116-3 of the Code, the circuit court nevertheless had the *discretion* to appoint counsel upon his request. Defendant maintains that the court's ruling that it lacked the authority to do so was erroneous, and an abdication of its discretion. The State urges that the silence in section 116-3 relating to the appointment of counsel should be interpreted as an affirmative *bar* on the appointment of counsel.

¶ 51        Initially, there can be no doubt that defendant had no right, constitutionally or statutorily, to counsel in the below proceedings. Nevertheless, that statute does not affirmatively prevent the appointment of counsel. For guidance we turn to Division 3-4 of the Counties Code, titled "Public Defender and Appointed Counsel." 55 ILCS 5/3-4000 *et seq.* (West 2016). Subsection 4006 of that Division is titled "Duties of public defender" and provides in part: "The Public Defender, as directed by the court, shall act as attorney, without fee, before any court within any county for all persons who are held in custody or who are charged with the commission of any criminal offense, and who the court finds are unable to employ counsel." *Id.* § 3-4006.

¶ 52        Under the Counties Code, it would appear that the court does have the discretion to appoint the public defender for any person who meets the above criteria. Defendant was in custody when he requested counsel, and the court, at the very least, did not inquire into his ability to employ counsel. While it was not error for the court to deny defendant counsel, the court did err in concluding that it did not have the *authority* to do so.

- 15 -

¶ 53    We find, however, that any technical error committed by the court was undoubtedly harmless. Appointed counsel on appeal identified only four pieces of evidence from defendant's motion to which it could be nonfrivolously argued that defendant was entitled to testing. In conducting a *de novo* review, we concluded that the outerwear in question—Shaw's shirt, pants, and belt—could not yield materially relevant evidence. This conclusion was based upon the uncontroverted facts that Shaw had worn those clothes all day and even played basketball for an hour with up to nine other men. The appointment of counsel below could not have changed this result.

¶ 54                                    III. CONCLUSION

¶ 55    For the foregoing reasons, we affirm in part and reverse in part the judgment of the circuit court of Will County and remand for further proceedings.

¶ 56    Affirmed in part, reversed in part, and remanded for further proceedings.