2025 IL App (1st) 231074-U

No. 1-23-1074

Order filed September 3, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 92 CR 4451 |
| | ) | |
| ERIC TAYLOR, | ) | Honorable |
| | ) | Geraldine D'Souza, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's judgment denying defendant's motion for forensic testing is reversed and the cause remanded for further proceedings.

¶ 2    Defendant Eric Taylor and his codefendant, Jonathan Judkins, were convicted of the 1992 first degree murder of Ronnie Mays. Defendant was sentenced to natural life in prison and we affirmed that conviction on direct appeal. *People v. Taylor*, No. 1-98-0330 (Jan. 21, 2000) (unpublished order under Illinois Supreme Court Rule 23). In 2015, defendant filed a motion

seeking DNA and fingerprint testing that could not be performed at the time of trial. The trial court denied that request and defendant now appeals.

¶ 3 For the reasons that follow, we reverse the judgment of the trial court and remand for further proceedings consistent with this order.[1]

¶ 4                                    I. BACKGROUND

¶ 5 Our order disposing of defendant's direct appeal contains a summary of the trial proceedings, some of which we recite here as required for an understanding of defendant's motion.

¶ 6 Mays was shot and killed sometime in the early morning hours of January 29, 1992, in Harvey, Illinois. His body was found in the passenger seat of a blue Chevrolet Cavalier. The passenger side windows were destroyed while the driver side windows were intact. Mays had shotgun wounds to the back of his head and the right side of his upper back, and bullet entry wounds on his right arm and right side of his back. There was blood and brain matter on the passenger side mirror. A crime scene technician believed that all the shots were fired from the passenger side of the car, and that Mays was shot with a rifle first and then shot with the shotgun after the passenger side window was already destroyed.

¶ 7 Later that day after Mays was killed, two men, Joseph Hester and Rico Bolian, identified defendant in separate lineups. At a pretrial hearing on a motion to suppress identification, the parties stipulated that Hester viewed a lineup consisting of three fillers and a suspect named Gary Austin. Hester made no identification. He then viewed a lineup with the same three fillers and a suspect named Eddie Brown and, again, made no identification. Hester was then presented with a

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

third lineup with the same three fillers and defendant, who Hester identified. Police presented Hester with a fourth lineup with the same three fillers and codefendant Judkins, and Hester identified Judkins.

¶ 8     The police followed a similar procedure with Bolian. First, he was presented with a lineup with three fillers and Austin, and Bolian identified Austin as the perpetrator. Next, he viewed a lineup with the same three fillers and Judkins and identified Judkins. Third, he viewed a lineup with the same three fillers and defendant, and Bolian identified defendant.

¶ 9     At trial, Hester explained that he and Mays were driving in Hester's Cavalier when Mays asked Hester to stop in an alley so Mays could talk to some people. Hester parked next to an apartment building and Mays exited the vehicle to speak with two men by a parked red Buick Regal. When Mays returned, Hester tried to leave but the Regal pulled in front of him and blocked his exit. A man armed with a shotgun approached the passenger side door, opened it, and declared, "You guys are going with us." The man then struck Mays with the gun.

¶ 10     A second person with a shotgun opened the rear driver side door and started to get into the car. Hester was only able to look at this second man for about a second, and then Hester fled into a nearby yard and hid under a porch. As he fled, he heard two gunshots. Hester's testimony established Judkins as the person who approached the passenger side of the car, and defendant as the person who entered the back seat from the driver side. When shown a photo of the lineup, Hester initially identified one of the fillers as the perpetrator before changing his answer and identifying defendant in the photo. He also became unsure if defendant was the individual who opened the passenger side or driver side door.

¶ 11    Bolian testified against defendant in exchange for minimum-sentence plea deals for pending armed robbery and attempted murder prosecutions. He was at a friend's apartment watching her children when he heard squealing tires outside. He looked out the window and saw someone standing on the passenger side of a blue Cavalier and someone else standing next to a Regal parked nearby. Sometime later, Bolian heard gunshots. When he looked out the window a second time, he saw two people firing into the Cavalier, one on the driver side and one on the passenger side. He identified Judkins as the person who fired into the car from the passenger side, and defendant as the person who fired into the driver side. When the shooting stopped, a third person driving the Regal pulled up next to the Cavalier. Judkins and defendant entered the Regal and it drove away. A few minutes later, the person who had been driving the Regal returned and drove away in the Cavalier. Bolian denied that the Regal was blocking the Cavalier in and he did not see anyone flee the Cavalier.

¶ 12    Bolian was impeached with his testimony from the pretrial hearing where he claimed he saw both shooters approach the Cavalier and that he did not see anyone with a shotgun and instead saw a rifle and a handgun. He was also impeached with his pretrial hearing testimony where he claimed that defendant was standing by the Regal and it was Austin who fired into the driver side of the Cavalier. It was not until several days before trial that Bolian informed prosecutors that defendant was one of the shooters.

¶ 13    Bolian also testified that he did not call the police and he could not remember if he told his friend about the incident when she returned to the apartment 10 to 15 minutes later. He later passed Judkins in the hall, but neither man said anything to each other. Bolian left the apartment a few

hours later and was arrested on an unrelated matter. He did not mention the shooting until he saw the Cavalier in the police station's garage and saw Judkins in the lockup.

¶ 14    Around 2:30 a.m. on the morning of the shooting, police responded to a report of a possible auto theft in progress. They observed a blue Camaro parked near a maroon Regal. Defendant and Judkins exited the Camaro, spoke with someone in the Regal, returned to the Camaro, and drove away. The officer followed defendant in the Camaro and pulled him over when he learned that the Regal had been reported stolen. Defendant was arrested for driving without a license and proof of insurance.

¶ 15    A shotgun and a spent shotgun shell were recovered from the Regal. Spent 30-30 rifle cartridges were found at the scene of the crime, and live 30-30 rounds were later discovered at Judkins's home. A firearms expert testified that the live rounds had been chambered into the same firearm as the spent cartridges.

¶ 16    The shotgun, the shotgun shell, and the Cavalier were processed for fingerprints. A single latent print suitable for comparison was found on the Cavalier's door handle which belonged to Hester. No fingerprints were found on the shotgun or the shotgun shell. Defendant's fingerprints were not found on any of the collected evidence.

¶ 17    In May 2015, defendant filed his motion for forensic testing. The trial court denied that motion on September 23, 2015, on the basis that it was untimely and that defendant was not granted leave to file it. Defendant filed a motion to reconsider, a motion for leave to file a section 116-3 motion, and a proposed section 116-3 motion on October 18, 2015. 725 ILCS 5/116-3 (West 2014). Defendant's proposed motion sought testing of the Chevrolet Cavalier for fingerprints.

¶ 18    On May 2, 2016, defendant filed a supplement to his section 116-3 motion in which he requested both fingerprint and DNA testing of a spent shotgun shell entered into evidence at trial. On May 20, 2016, the trial court appointed counsel to represent defendant. Nearly six years later, appointed counsel informed the trial court that it would be standing on defendant's *pro se* motion.

¶ 19    On January 6, 2023, the State filed a response seeking the denial of defendant's motion. Following a hearing on June 2, 2023, where appointed counsel provided no argument, the trial court denied defendant's section 116-3 motion. Defendant filed a notice of appeal on June 2, 2023, and this appeal followed.

¶ 20                                  II. ANALYSIS

¶ 21    On appeal, defendant argues that the trial court erred in denying defendant's section 116-3 motion and, alternatively, that he was entitled to the reasonable assistance of counsel, which he did not receive. We need not reach defendant's second contention.

¶ 22    Pursuant to section 116-3 of the Code of Criminal Procedure, defendants may make a motion in the trial court for the performance of fingerprint, integrated Ballistic Identification System, or forensic DNA testing on evidence that was secured in relation to the trial or guilty plea which resulted in the defendant's conviction. 725 ILCS 5/116-3(a) (West 2014). The testing requested must either be testing to which the evidence was not subjected at the time of trial or utilize new methods not scientifically available at the time of trial that provides a reasonable likelihood of more probative results. *Id*.

¶ 23    To be entitled to testing, a defendant must make a *prima facie* case that: (1) identity was the issue in the trial or guilty plea which resulted in his or her conviction; and (2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been

substituted, tampered with, replaced, or altered in any material aspect. 725 ILCS 5/116-3(b) (West 2014).

¶ 24    Once a defendant has made such a *prima facie* showing, the trial court shall allow testing under reasonable conditions upon a determination that: (1) the testing has the scientific potential to produce new, noncumulative evidence that is materially relevant to the defendant's assertion of actual innocence and (2) the testing requested employs a scientific method generally accepted within the scientific community. 725 ILCS 5/116-3(c) (West 2014).

¶ 25    We review the denial of a section 116-3 motion *de novo*. *People v. LaPointe*, 2018 IL App (2d) 160432, ¶ 20.

¶ 26    The parties do not dispute that identity was an issue at defendant's trial, and on appeal defendant has abandoned his request for fingerprint testing. Thus, we confine our analysis to defendant's request for DNA testing of the car and shotgun shell and whether: (A) he made a *prima facie* showing as to chain of custody; (B) DNA testing is generally accepted; and (C) the requested testing has the potential to reveal new, noncumulative materially relevant evidence.

¶ 27                                  A. Chain of Custody

¶ 28    A defendant's assertion that the evidence sought to be tested has remained in the State's control since the time of trial is sufficient to establish a *prima facie* case of sufficient chain of custody under section 116-3. *People v. Perez*, 2016 IL App (3d) 130784, ¶ 28 (citing *People v. Johnson*, 205 Ill. 2d 381, 394 (2002)). This standard exists because a defendant will not have access to information regarding the actual chain of custody. *Id*. The introduction of evidence at trial is *prima facie* evidence that the evidence has been subjected to a sufficient chain of custody

under section 116-3. *Perez*, 2016 IL App (3d) 130784, ¶ 28 (citing *People v. Shum*, 207 Ill. 2d 47, 66 (2003)).

¶ 29 However, a defendant's conclusory assertion that evidence remains in the State's control is subject to some limitations. In *People v. Jones*, defendant sought DNA testing of a knife used to stab a murder victim and fingernail clippings taken from the victim. *People v. Jones*, 334 Ill. App. 3d 61, 63, 66 (2002). Neither of these items were introduced at trial, and instead defendant pointed to a crime lab document titled "Request for Evidence" which mentioned the knife and had a checked box indicating right and left fingernail clippings. *Id*. at 64. Nothing else in the record indicated those items were ever collected, preserved, transported, or stored aside from that document. *Id*. at 65. Thus, the court found that defendant had not made a *prima facie* showing of chain of custody. *Id*.

¶ 30 Defendant's request to perform DNA testing on Hester's blue Chevrolet Cavalier is analogous to *Jones*. The car was not an exhibit and never introduced into evidence. Nothing in the record reflects what happened to the vehicle after crime scene technicians processed it. The whereabouts of the car for the last three decades is a complete mystery. It may have been returned to the owner, sold, or, more likely, at some point between now and then, reduced to scrap. Presuming that the State has maintained a sufficient chain of custody over it based on a conclusory allegation and nothing more makes little sense.

¶ 31 The shotgun shell, however, is different. It was admitted into evidence at trial as an exhibit, and therefore we can presume that it has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect. 725

ILCS 5/116-3(b) (West 2014); *Perez*, 2016 IL App (3d) 130784, ¶ 28 (citing *Shum*, 207 Ill. 2d at 66).

¶ 32    The State insists that defendant cannot establish a *prima facie* case for chain of custody because the shotgun shell was handled by multiple people including attorneys, law enforcement, and jurors. As evidence for this, it cites only its written response to defendant's motion in the trial court, which in turn cited nothing in the record, and the trial court's ruling that the shotgun shell was handled by multiple people.

¶ 33    Defendant, instead, directs us to the trial testimony of the crime scene technician, Melvin Trojanowski, who testified that he recognized People's Exhibit 45 as a 12-gauge shotgun shell that was recovered from the Buick. He packaged the shotgun shell in its original packaging and testified that the shell and the original packaging appeared to be in the same condition as when he submitted them to the crime lab. Trojanowski also explained that the crime scene was secured to prevent accidental tampering or movement of the evidence, and that he was trained to collect evidence in a way that avoided any contamination from himself.

¶ 34    Furthermore, multiple cases bear out that this sort of speculation about what *might have* happened to the evidence is not relevant when considering whether defendant established a *prima facie* showing of chain of custody. In *People v. LaPointe*, the defendant sought forensic testing and the State argued that remand was necessary to first determine whether there was a proper chain of custody because, owing to the age of the evidence, it may not have been in a condition to permit meaningful testing or viable results. *People v. LaPointe*, 2018 IL (2d) 160432, ¶¶ 40-41. The court reasoned that such a possibility did not affect whether defendant's motion made a *prima facie* case that the evidence was subject to a proper chain of custody. *Id*. ¶ 41.

¶ 35    Likewise, in *People v. Galloway*, which serves as persuasive authority, the defendant sought forensic testing of a firearm and the State argued that the record did not indicate that "any measure of care was taken" to preserve potential fingerprints or that the parties handling the firearm at trial wore gloves. *People v. Galloway*, 2023 IL App (1st) 211489-U, ¶¶ 40-41. However, the court rejected the State's argument, holding that the correct standard was whether defendant had made a *prima facie* showing of chain of custody, and that the fact that the firearm was a trial exhibit and presumably remained in the State's custody was sufficient. *Id*. ¶ 43 (citing *LaPointe*, 2018 IL App (2d) 160432, ¶ 41).

¶ 36    Here, the shotgun shell for which defendant seeks DNA testing was admitted at trial as an exhibit, and therefore similarly can be presumed to have remained in the State's custody, free from tampering or alteration. *Perez*, 2016 IL App (3d) 130784, ¶ 28 (citing *Shum*, 207 Ill. 2d at 66). The State's concerns that the shotgun shell may have been contaminated by lawyers or jurors handling it does not factor into whether defendant made a *prima facie* showing of chain of custody.

¶ 37    Accordingly, we hold that defendant made a *prima facie* showing of both identity and that the shotgun shell has been subject to a sufficient chain of custody. Having determined that defendant made the requisite *prima facie* showing for the shotgun shell, but not for Hester's vehicle, we turn to whether the testing of the shotgun shell has the scientific potential to produce new, noncumulative evidence that is materially relevant to the defendant's assertion of actual innocence and whether DNA testing employs a scientific method generally accepted within the scientific community. 725 ILCS 5/116-3(c) (West 2014).

¶ 38                    B. General Acceptance of DNA Testing

¶ 39    Defendant's supplemental motion specifically requested DNA and fingerprint testing of the shotgun shell recovered from the Buick. On appeal, defendant has pursued only the DNA portion of that request. DNA testing is undeniably generally accepted in the scientific community. *People v. Kines*, 2015 IL App (2d) 140518, ¶ 30. Thus, we can proceed to our analysis of whether defendant's requested testing of the shotgun shell has the potential to produce materially relevant evidence.

¶ 40                 C. Materially Relevant New, Noncumulative Evidence

¶ 41    As previously noted, after defendant establishes a *prima facie* case, the trial court shall order testing if the testing has the scientific potential to produce new, noncumulative evidence that is materially relevant to the defendant's assertion of actual innocence. 725 ILCS 5/116-3(c) (West 2014).

¶ 42    To be materially relevant, evidence need not exonerate the defendant. *Johnson*, 205 Ill. 2d at 395. Instead, it must tend to significantly advance a claim of actual innocence. *Id*. The determination of whether the evidence to be tested is materially relevant requires an evaluation of the evidence introduced at trial, as well as the evidence defendant seeks to test. *Id*. at 396. This is an independent determination, meaning that the strength of the State's evidence is not a hurdle that the defendant must overcome. *Kines*, 2015 IL App (2d) 140518, ¶ 31.

¶ 43    Before we discuss how DNA evidence might advance defendant's claims of innocence, we first address the State's argument focusing on the words, "scientific potential," and that defendant has not pled any facts to support that touch DNA can be collected from evidence that is more than three decades old. The State did not raise this argument in the trial court. Even if we did not

consider it forfeited, the State offers no authority for its argument that an indigent, incarcerated defendant must be able to supply specialized, technical knowledge about the limits of DNA analysis before he can be entitled to forensic testing. Furthermore, *LaPointe* considered a request for DNA testing with evidence that was nearly 40 years old where the State raised a similar argument that the age of the evidence might prevent meaningful testing. *LaPointe*, 2018 IL App (2d) 160432, ¶ 41. The court nevertheless ordered testing. *Id*. ¶ 57. As for whether the testing has the potential to produce materially relevant results, we can look to other cases for guidance.

¶ 44    In *Johnson*, the defendant was convicted of sexually assaulting a woman and murdering her boyfriend. *Johnson*, 205 Ill. 2d at 385. The victim identified the defendant from a photo array, and a search of the defendant's truck yielded hairs resembling the victim's, bloodstains, a steak knife, and reddish brown fibers. *Id*. at 386. A search of defendant's home also yielded three .357 Magnum cartridges. The defendant sought DNA testing of a rape kit completed when the victim was at the hospital. *Johnson*, 205 Ill. 2d at 391. The supreme court reasoned that the case against defendant was strong, but circumstantial, with only the victim's identification serving as direct evidence of the defendant's guilt. *Id*. at 396. Thus, it concluded that favorable testing results would significantly advance the defendant's claim. *Id*. at 396-97.

¶ 45    In *People v. Grant*, the defendant was convicted of aggravated criminal sexual assault and sought DNA testing of a hair and fingernail clippings. *People v. Grant*, 2016 IL App (3d) 140211, ¶¶ 3, 11. No physical evidence was introduced at the defendant's trial that directly linked him to the offense. *Id*. ¶ 26. Instead, the victim had asked the defendant to examine something in her bedroom and later accused the defendant of having sex with her when her brother entered the room. *Id*. ¶ 8. The court concluded the defendant was entitled to testing and reasoned that if the tested

evidence did not match the defendant, that evidence would stand alone because of the lack of other forensic evidence. *Id.* ¶ 26. And if the tested evidence matched the victim's brother, who the defendant claimed was the one who had sex with the victim, it would bolster's defendant's credibility. *Id.*

¶ 46    The evidence against defendant here, in comparison, was hardly overwhelming. There was likewise no forensic evidence to link defendant to the crime, and he was not found in possession of any of the firearms used. The only direct evidence of his involvement came from two eyewitnesses. As we have summarized, those identifications were fraught with problems. Additionally, Hester's identification was based on turning around in his car and looking at defendant for "about a second," and his account differed significantly from Bolian's. Furthermore, Bolian's account was marred by significant impeachment and an undeniable self-interest in obtaining reduced sentences for his own crimes. The absence of defendant's DNA on the shotgun shell, or the identification of another DNA profile, would be new, noncumulative evidence that would advance defendant's claim of innocence, especially in light of the weak evidence at trial.

¶ 47    The State claims that defendant could still be guilty even if defendant's DNA is absent and another person's DNA is present. *Grant* considered a similar argument where the State argued that a nonmatch to defendant, or a match to the victim's brother, did not necessarily mean that the defendant was innocent. *Grant*, 2016 IL App (3d) 140211, ¶ 27. The court reasoned that, while the State was correct, the argument ignored the standard set forth in section 116-3—whether the result could advance the defendant's claim that he was innocent. *Id.*

¶ 48    We can say the same here. The absence of defendant's DNA on the shotgun shell, or even the inclusion of another DNA profile, identified or unidentified, is not dispositive of whether

defendant is innocent. Indeed, defendant could have committed the crime even if his DNA is absent or someone else's DNA is present. But at this stage we need not engage in speculation about what it would mean, precisely, for defendant's DNA to be absent or someone else's DNA to be found on the shotgun shell, whether unidentified or if matched to someone else in a pre-existing database. Our standard is not whether the testing would exonerate defendant. It is only whether the testing has the potential to produce new, noncumulative evidence that will advance defendant's claim. 725 ILCS 5/116-3(c) (West 2014).

¶ 49    The problems identified by the State point to whether defendant can ultimately obtain a new trial, not whether he is entitled to the testing in the first place. As *LaPointe* said, "we construe section 116-3 liberally to favor its purpose of making the criminal justice process more reliable by allowing, where there is a reasonable basis, the acquisition of sound scientific evidence that is probative on the issue of identity." *LaPointe*, 2018 IL App (2d) 160432, ¶ 56. This process, whether the evidence ultimately favors the State or defendant, contributes to the reliability of the criminal process and confidence in the ultimate result, and we should not set the hurdles for obtaining DNA testing so high as to endanger the purpose of section 116-3. *Id*. *LaPointe* reasoned that the scope of section 116-3 should be resolved in favor of more probative evidence. *Id*. We agree.

¶ 50    Accordingly, DNA testing of the shotgun shell in this case is warranted, and if appropriate, the results should be compared to defendant or other samples collected by criminal justice agencies as outlined in section 116-3(a). 725 ILCS 5/116-3(a) (West 2014).

¶ 51                                    III. CONCLUSION

¶ 52      For the foregoing reasons, we reverse the judgment of the trial court and remand for further

proceedings consistent with this order.

¶ 53      Reversed and remanded.